**STATE of Tennessee, Appellee,**

v.

**Alexander FEARS, Appellant.**

Court of Criminal Appeals of Tennessee, at Nashville.

June 14, 1983.

Petition to Rehear Denied
July 8, 1983.

Permission to Appeal Denied by
Supreme Court Oct. 11, 1983.

Fred C. Dance, Nashville, for appellant.

William M. Leech, Jr., Atty. Gen., David M. Himmelreich, Asst. Atty. Gen., Dan Hamm, Mary Rubin, Asst. Dist. Attys. Gen., Nashville, for appellee.

## OPINION

TATUM, Judge.

The defendant, Alexander Fears, was convicted for aggravated rape committed upon Theresa Leggs, 5 years of age. Punishment was fixed at imprisonment for life. On this appeal, the defendant has presented 11 issues for review. After considering the issues and the record, we conclude that the judgment of conviction must be affirmed.

We will first consider the eleventh issue in which the defendant attacks the sufficiency of the evidence. The defendant was convicted of violating T.C.A. § 39–2–603 by making unlawful sexual penetration of a victim who was under the age of 13 years.

The victim's mother, Dorothy Leggs, testified that her daughter was born on December 23, 1975. Ms. Leggs was divorced from Theresa's father and the defendant lived with her from February to August, 1981, except for about 2 days after July 4, 1981. Theresa addressed the defendant as "Alex" and "Daddy." Ms. Leggs was employed and occasionally the defendant kept the victim and Ms. Leggs' other child, John.

Acting upon information received from a friend of the victim, Ms. Leggs testified that she questioned both the defendant and the victim. The defendant denied any improper conduct with the victim but the child said that the defendant "had tried to put his private in her mouth." This conversation took place during the latter part of July, 1981. Subsequently, the child's vagina became sore and began to discharge. Ms. Leggs took her to General Hospital, and on August 11, 1981, as a result of information she received from medical personnel, she put the defendant out of her house. For about one month prior to that, the defendant had abstained from having sexual intercourse with Ms. Leggs, telling her that he had a boil close to his private area. Ms. Leggs further testified that the treating doctor asked the victim on August 11, 1981, who had sexually bothered her; the victim then became very emotionally upset and began crying, and stated that "Daddy" had bothered her. Ms. Leggs took the child to Christian Counseling's Service for counseling.

When questioned seriously and persistently by her mother in July regarding sexual contact with the defendant, the child eventually stated that she had made up the story about sexual penetration. The child seemed to be in a state of shock when questioned by her mother because the mother was so upset when talking with her.

The victim testified that the defendant on one occasion had taken her into the bathroom, removed her clothing, put two towels on the floor, had her lie down, and got on top of her and "went up and down." The defendant's "private" was touching her "private." The defendant also put his private in her mouth, at which time she vomited. Afterward, the defendant gave the victim a piece of candy and told her not to tell her mother. The mother had testified that the victim called her vagina her "private," her rectum her "bootie," and a penis a "private."

On cross-examination, the victim admitted that she had first told her mother about the episode and then told her mother that she had "made-up" the story. However, the victim persisted the events did in fact take place.

The victim further testified that sexual encounters took place more than one time. They occurred in the bathroom and in the victim's room while her mother was asleep in the daytime and her brother was outside playing. She did not cry during these encounters, but she did vomit.

Officer Donzaleigh Heard testified that she arrested the defendant on August 12, 1981. At the time of the defendant's arrest, he told the officer that he had had a discharge for several days. He told her that it was caused by a back strain and that the child could have caught his discharge by using his washcloth.

Dr. Robert Schoumacher testified that on August 8, 1981, he examined the victim and found discharge from her vagina and inflammation of her throat. He placed some of the discharge under a microscope and made a diagnosis of gonorrhea. His diagnosis was confirmed by the laboratory. The victim's hymen was not intact.

Julia Chadwick, keeper of the records at Lentz Health Center, testified that the clinical records reflected that on August 10, 1981, defendant was found to have gonorrhea and was treated for it. Dr. Robert Guinn testified that on August 10, 1981, he

treated the defendant for gonorrhea at Lentz Health Center.

Judith Kohler, psychological examiner at Christian Counseling Service, testified that the victim's mother brought the victim to the institution on October 19, 1981. As part of the analysis, Mrs. Kohler had the victim draw a picture of her family, and the victim scribbled all over her drawing of the defendant and stabbed it with a pencil.

The defendant testified that the victim addressed him as "Alex," never as "Dad," or "Daddy." After an argument with Ms. Leggs concerning the use of an automobile, the defendant left the home of Ms. Leggs for a week or two weeks in July. The defendant denied having sexual contact with the victim and testified that he was never alone with the children.

Pursuant to a ruling of the court at the conclusion of the State's proof, the State elected to prosecute on the oral, rather than the vaginal, intrusion. The defendant argues that there was no evidence of a sexual penetration within the meaning of T.C.A. § 39–2–603 (1982). He bases this argument on the victim's testimony:

"MRS. RUBIN: Where was his private touching you?

A. My private.

Q. Did he put his private anywhere else Theresa?

A. Yes.

Q. Where?

A. My mouth.

Q. When he did that what happened to you?

A. I throwed up."

The defendant argues that there was no evidence of even a slight intrusion as required by T.C.A. § 39–2–602(11) because the child did not use the word "in" before "my mouth." However, there is abundant testimony upon which a rational jury could infer that the defendant's penis intruded into the victim's mouth. The victim testified that she "threw up." There was expert testimony that both the victim and the defendant had gonorrhea at about the same time and that the victim's gonorrhea culture taken from her throat was positive.

We have reviewed the entire record and find abundant evidence upon which a rational jury could be convinced beyond a reasonable doubt of the defendant's guilt. We must therefore overrule this issue. Rule 13(e), T.R.A.P.

In the eighth, ninth, and tenth issues, the defendant contends that a specific date of the offense should be stated in the indictment and that at trial the court should have required the State to specify a certain calendar date upon which the offense occurred. The indictment charged that the defendant had committed aggravated rape upon the victim "on the ____ day of July, 1981." The defendant says that there is a material variance between the indictment and the proof because the proof does not show that the offense was committed in July. Since time is not an essence of the offense and time will not bar the commencement of prosecution of this offense (T.C.A. § 40–2–101), the time of the commission of the offense averred in the indictment is not material, and proof is not confined to the time charged. *Sullivan v. State,* 513 S.W.2d 152 (Tenn.Cr.App.1974); *Prince v. State,* 529 S.W.2d 729 (Tenn.Cr. App.1975).

The defendant cites several cases holding that when the State's proof showed several offenses were committed, then the State, at the close of its proof in chief, must elect the particular offense upon which it will rely for conviction. In making the election, it is not required that the State specify the date of the offense for which it will ask a conviction, but it is necessary for the State to designate a particular offense. Often, this is done by specifying a date when the record reflects that the several offenses were committed on different dates. However, in the instant case, the State particularized the offense by designating the oral act. This is sufficient. *Burlison v. State,* 501 S.W.2d 801 (Tenn.1973).

Defendant asserts that it was error to allow the testimony of the 6-year-old

victim; he says that she did not understand the obligation of the oath and did not possess sufficient intelligence to testify with an understanding mind, or respond in an intelligent manner to the questions propounded to her. The rule is that at the age of 14 years, a witness is presumed to be competent but the presumption does not arise as to witnesses under that age. It is the duty of the judge to examine a child under the age of 14 years to ascertain if he is competent. The judge should determine whether: the child understands the nature and meaning of an oath, is of sufficient intelligence to comprehend the things about which he is called to testify, and is capable of knowing and relating the facts accurately. The determination is within the discretion of the trial judge and his discretion will be reviewed only for gross abuse. *Ball v. State,* 188 Tenn. 255, 219 S.W.2d 166 (1949); *State v. Braggs,* 604 S.W.2d 883 (Tenn.Cr. App.1980); *State v. Grady,* 619 S.W.2d 141 (Tenn.Cr.App.1980).

■ The trial judge first conducted the preliminary interrogation of the victim and then permitted defense counsel to cross-examine her. The Court asked the child, "What is a lie?" She answered, "If you tell a story you will get a whipping." She testified that "You won't get no (sic) whipping (if you) tell the truth." She also stated to the trial judge that everyone should always tell the truth and when sworn to tell the truth; that the oath means "Tell the truth." Though the witness testified that she had forgotten the meaning of an oath as explained to her by the Assistant District Attorney, we think that the evidence supports the trial judge's findings that although she could not define the meaning of an oath, she was sensitive to the obligation to tell the truth under oath. She was aware that if she told an untruth, she would be punished. T.C.A. § 24–1–101 requires only that a witness "*understand* the obligation of an oath;" there is no requirement that the witness have sufficient academic learning to define an oath or articulate its obligations. During her qualifying examination and also during her testimony, she demonstrated the ability to recall the events about which she testified and to relate the pertinent facts. Her candor in responding to the questions is obvious. We do not find that the trial judge abused his discretion in permitting the child to testify.

■ The defendant next insists that medical records concerning his having gonorrhea in August, 1981 should have been suppressed. The defendant asserts that he had a legitimate expectation of privacy in the medical record at Lentz Public Health Center and that the seizure by a subpoena instead of a search warrant violated his Fourth Amendment rights. We first note that the defendant had neither possession nor ownership of the records.

In *United States v. Miller,* 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976), an internal revenue agent subpoenaed the defendant's financial records from the defendant's bank. As here, an attack was made on the constitutionality of the subpoena on the ground that the depositor had a legitimate expectation of privacy in his bank records and that they were therefore protected by the Fourth Amendment. In holding that the bank records were not so protected, the Supreme Court said:

"The depositor takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government. (citations omitted). This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed. (citations omitted.)

\* \* \* \* \* \*

"Since no Fourth Amendment interests of the depositor are implicated here, this case is governed by the general rule that the issuance of a subpoena to a third party to obtain the records of that party does not violate the rights of a defendant, even if a criminal prosecution is contem-

plated at the time of the subpoena is issued. (sic) (citations omitted) Under these principles, it was firmly settled, before the passage of the Bank Secrecy Act, that an Internal Revenue Service summons directed to a third-party bank does not violate the Fourth Amendment rights of a depositor under investigation. (citations omitted.)"

We think that the same principle applies to medical records as to bank records and that the above holding of the *Miller* case is applicable. The defendant enjoyed no Fourth Amendment protections of his medical records in possession of and owned by the health center. "The Fourth Amendment does not guarantee to a person security against search, reasonable or unreasonable, in papers which are not that person's property and are not in his possession." *In Re Upham's Income Tax,* 18 F.Supp. 737 (S.D.N.Y.1937).

Furthermore, in Tennessee, as at common law, neither the patient nor the physician has a privilege to refuse to disclose in court a communication of one to the other, nor does either have a privilege that the communication not be disclosed to a third person. *Quarles v. Sutherland,* 215 Tenn. 651, 389 S.W.2d 249 (1965).

The defendant also insists that his records at the medical institution were protected by the following code sections:

T.C.A. § 68–10–101:

"... All information and reports concerning persons infected with venereal diseases shall be confidential and shall be inaccessible to the public, except insofar as publicity may attend the performance of the duties imposed upon health officers in enforcing the provisions of this chapter ..."

T.C.A. § 10–7–504(a):

"Confidential records.—(a) The medical records of patients in state hospitals and medical facilities, and the medical records of persons receiving medical treatment, in whole or in part, at the expense of the state, shall be treated as confidential and shall not be open for inspection by members of the public. Additionally, all investigative records of the Tennessee bureau of criminal identification shall be treated as confidential and shall not be open to inspection by members of the public. The information contained in such records shall be disclosed to the public only in compliance with a subpoena or an order of a court of record, ..."

We do not think that these code sections are applicable. While they protect medical records of patients from members of the public, the statutes do not protect the medical records from the courts and public officials, such as the District Attorney General, in the performance of their official duties. T.C.A. § 68–10–104 expressly requires state health officers to cooperate with proper officials whose duty it is to enforce laws against prostitution, lewdness, assignation, and the spread of venereal disease. Courts, grand juries, and district attorneys are not embraced in the term "public" as used in these statutes. The records may be subpoenaed to court at the request of any party to a litigation acting in good faith. Moreover, the admission of the medical records did not prejudice the defendant; he admitted at trial that he had gonorrhea at the time disclosed by the medical records.

The defendant also asserts that the evidence should have been suppressed because it came into the hands of the District Attorney's office before it was subpoenaed by the grand jury. He says that the District Attorney General has no power to issue a subpoena and that the subpoena bringing the evidence to the District Attorney was invalid because it was unsigned. However, the defendant had no standing to challenge either the validity of the subpoena or the authority of the District Attorney to issue it. The person to whom the subpoena was directed was the only party having standing to contest the validity of the subpoena. *Sheets v. Hathcock,* 528 S.W.2d 47 (Tenn.Cr.App.1975). Many witnesses consent to come to court without the necessity of a subpoena; this does not render them incompetent witnesses. As previously stated, the evidence was not privileged.

In the next issue, the defendant says that the trial court erred in permitting Dr. Robert Schoumacher to testify as an expert. He testified that he examined and treated the victim at General Hospital on August 8, 1981 and on two succeeding occasions. Dr. Schoumacher testified that he took cultures from the victim and examined them under the microscope. He found the cells and bacteria to be compatible with gonorrhea.

■ The doctor was a fourth year medical student at Vanderbilt University when he examined the victim. He had studied the disease as a medical student both in the laboratory and by the examination of living patients. He had heard several lectures on the subject and had studied it in many articles and books. At the time he testified, he had graduated from Vanderbilt Medical School with an M.D. Degree, but had not been licensed to practice medicine. The defendant says that the trial court erred in permitting him to testify as an expert because he had not been licensed. No authority is cited that is applicable. One who has specialized knowledge, skill, or experience can qualify as an expert. D. Paine, *Tenn. Law of Evidence,* § 174 (1974).

■ The question of competency of an expert witness is within the discretion of the trial court and the trial court's decision will not be reversed on appeal, absent clear abuse of discretion. *Matlock v. State,* 566 S.W.2d 892 (Tenn.Cr.App.1978); *Taylor v. State,* 551 S.W.2d 331 (Tenn.Cr.App.1976). In view of the doctor's training and experience with the disease, we do not find that the trial court abused its discretion. This issue is without merit.

■ The defendant next complains of evidence admitted from laboratory reports that the victim and the defendant both had gonorrhea. Dr. Schoumacher testified that he took a culture from the victim, labeled it and sent it to the laboratory of Nashville General Hospital. He was certain that laboratory testing was handled in a routine manner. The laboratory identified the organism as nyceria gonorrhea and forwarded the samples to the State laboratory for further confirmation.

Julia Chadwick was a nurse who kept the records for Lentz Health Center. Records of the defendant made in August, 1981 indicated that laboratory testing of his discharge established that he had gonorrhea.

Neither of the witnesses participated in the laboratory testing. None of the technicians who conducted the tests testified and the record does not indicate that the State made any effort to procure the presence of any person who actually conducted the tests. The defendant states that the admission of this evidence violated his constitutional right of confrontation.

In *State v. Henderson,* 554 S.W.2d 117 (Tenn.1977), the Supreme Court held that three criteria must be met in criminal cases before the admission of business records under T.C.A. § 24–7–111 satisfies constitutional confrontation rights. These criteria are: (1) the evidence must not be "crucial" nor "devastating;" (2) the State must make a good faith effort to secure the presence of the person whose statement is to be offered against the defendant; and (3) the evidence offered under a hearsay exception must bear its own "indicia" of reliability. *Id.* at 119, 120.

The evidence that both the defendant and the victim had gonorrhea at the same time is both "crucial" and "devastating." It evinces not only that a crime was committed, but it also connects the defendant with the crime. However, in view of the other competent evidence that the parties had gonorrhea, we do not find that the evidence of the reports of the laboratory test were "crucial" or "devastating" in context of this record. The defendant concedes, and we agree, that the evidence meets the third test of reliability. The State made no effort to show that the second test was complied with; the record does not reflect that any effort was made to secure the presence of the persons who actually conducted the tests. We therefore hold that in the absence of a showing that a good faith effort was made, the evidence did not meet constitutional confrontation requirements. Also

see *State v. Armes,* 607 S.W.2d 234 (Tenn. 1980).

However, we are convinced beyond a reasonable doubt that this evidence was harmless. Dr. Schoumacher testified that he first examined the victim on August 8, 1981 and found that she had a mild vulva vaginitis with a discharge from her vagina. She had a mild periangitis or inflammation of the throat. The doctor's study of the discharge under a microscope revealed that it was compatible with gonorrhea, which was his "working diagnosis" before it was confirmed by the laboratory. The child's hymen was not intact. When the doctor treated the child specifically for gonorrhea, she responded to the treatment and was cured. The record contained no suggestion that the child had any disease other than gonorrhea. Aside from the laboratory report, the proof is clear that the victim was infected with gonorrhea.

There was strong evidence other than the medical records that the defendant had gonorrhea in August, 1981. Dr. Robert W. Quinn, a medical doctor, testified that he was Director of Tuberculosis and Venereal disease at the Metropolitan Health Department. In August, 1981, he began treating the defendant for gonorrhea. Ten days after treatment, the defendant returned to the witness with gonococcal urethritis, which is a disease that sometimes accompanies gonorrhea, although the symptoms appear later than gonorrhea symptoms. The treatment for gonococcal urethritis is different from that of gonorrhea. The defendant responded to the specific treatment for both diseases and was cured of both. Moreover, the defendant admitted on cross examination that he had symptoms of gonorrhea on August 10, 1981 and that he was treated for gonorrhea. Again, there is no suggestion in the record that the defendant did not have gonorrhea and the evidence, aside from the medical records, would support no other reasonable conclusion.

For the foregoing reasons, we hold that the error of admitting the laboratory tests made by persons not confronting the defendant was harmless by the standard fixed by Rule 36(b), T.R.A.P. We are also able to declare a belief that the evidence was harmless beyond a reasonable doubt. See *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). We therefore overrule these issues.

In another issue, the defendant states that the court erred in allowing Judith Kohler to testify as to the mental condition of the victim because the State failed to comply with the defendant's motion to discover the witness's mental examination pursuant to Rule 16(a)(1)(D), Tennessee Rules of Criminal Procedure. The defendant filed a discovery motion for permission to inspect and copy the results or reports of physical or mental examination, and other scientific tests or experiments discoverable under the rule. The rule is as follows:

"Rule 16. Discover and Inspection.—(a) ... (1) ... (D) Reports of Examinations and Tests.—Upon request of a defendant the state shall permit the defendant to inspect and copy or photograph any results or reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof, *which are within the possession, custody or control of the state,* the existence of which is known, or by the exercise of due diligence may become known, to the district attorney general and which are material to the preparation of the defense or are intended for use by the state as evidence in chief at the trial." (emphasis supplied)

Judith Kohler was not participating in the investigation or the preparation of the case, but had performed a mental examination of the victim pursuant to the request of the victim's mother. The psychiatric examiner refused to furnish to defense counsel any information concerning her examination of the victim without the consent of the victim's mother. The victim's mother refused to give consent.

The rule is applicable only to reports "which are within the possession, custody or control of the State." The examination by Mrs. Kohler was privately made at the instigation of the victim's mother. The State did not have possession, custody, or control

of the reports; they were controlled by the victim's mother and were in the actual possession or custody of the witness. The reports were not discoverable under Rule 16(a)(1)(D). The defendant relies on *State v. Hicks,* 618 S.W.2d 510 (Tenn.Cr.App.1981) holding that statements in the possession of the police are discoverable under the rule. However, material in the possession of the police is normally under the control of the District Attorney and is therefore discoverable. But, Ms. Kohler was not under the control of the State, nor did she work for any State agency. The fact that she cooperated and spoke to the District Attorney before trial is not determinative. As pointed out by the trial court, neither the court nor the District Attorney could force the witness to talk with anyone, including defense counsel, prior to trial. This issue is without merit.

 Finally, the defendant insists that the court erred "in allowing into evidence a picture allegedly drawn by Theresa Leggs because said picture's probative value was clearly outweighed by its prejudicial value." This "picture" is a drawing made by the victim of her family at the request of Ms. Judith Kohler, a licensed psychological examiner. The relevancy of the witness's testimony was not attacked, except for the drawing. The witness interpreted the drawing as showing the victim's animosity toward the defendant and the sexual penetration. It was not a photograph and has no shocking or gruesome effect, as the photograph in *State v. Banks,* 564 S.W.2d 947 (Tenn.1978). As stated in the *Banks* case, the admission of the drawing was within the discretion of the trial court and the ruling will not be overturned on appeal, except upon clear showing of abuse of discretion. We find no abuse of discretion or undue prejudicial effect in this drawing.

It results that the judgment of conviction is affirmed.

DUNCAN and CORNELIUS, JJ., concur.

## OPINION ON PETITION TO REHEAR

TATUM, Judge.

 The defendant has filed an earnest petition to rehear in which he states that denial of the Sixth Amendment right to confrontation requires an automatic reversal even though the evidence adduced was harmless beyond a reasonable doubt as that term is defined in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In support of this contention, the defendant cites *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *Smith v. Illinois,* 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968); *Brookhart v. Janis,* 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966); *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); and *Fahy v. Connecticut,* 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963). However, for reasons stated in the main opinion, we adhere to our view that the evidence of records showing that the defendant and the victim had gonorrhea made no contribution to the conviction and therefore, reversal is not required. This case is controlled by *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). In *Harrington,* the defendant was deprived of his right of confrontation by the admission of confessions of a codefendant implicating the defendant, in violation of the rule promulgated in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The codefendant who gave the confession did not take the stand, thereby depriving Harrington of his right to cross examine and confront him. The United States Supreme Court affirmed Harrington's conviction after finding that the tainted evidence was cumulative and overwhelming. We find the same situation in the case under consideration. In *Harrington,* the Supreme Court held that a departure from the constitutional right of confrontation did not require an automatic reversal. *See also Parker v. Randolph,* 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979); *Schneble v. Florida,* 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972); *United States v. Halliday,* 658 F.2d 1103 (6th Cir.

1981); *State v. Braggs,* 604 S.W.2d 883 (Tenn.Cr.App.1980). As stated in the main opinion, evidence other than the medical records left no reasonable conclusion except that the defendant and the victim had gonorrhea. We do not understand the cases cited by the defendant to hold that in every instance when hearsay evidence is erroneously admitted, no matter how unimportant or insignificant, a new trial is required. All such errors are not constitutional errors of the "first magnitude," which cannot be cured by any amount of showing of want of prejudice. *Harrington v. California, supra.*

The petition to rehear is denied.

DUNCAN and CORNELIUS, JJ., concur.