IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

FEBRUARY 1998 SESSION

FILED

May 22, 1998

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | * | C.C.A. # 01C01-9705-CC-00165 |
| Appellee, | * | MONTGOMERY COUNTY |
| VS. | * | Hon. Robert W. Wedemeyer, Judge |
| JOHN JASON BAKENHUS, | * | (Aggravated arson, arson, theft over $500, aggravated burglary, misdemeanor theft, |
| Appellant. | * | civil rights intimidation) |

For Appellant:

Gregory D. Smith
One Public Square, Ste. 321
Clarksville, TN 37040
(on appeal)

Edward E. DeWerff
103 S. Third Street
Clarksville, TN 37040
(at trial)

For Appellee:

John Knox Walkup
Attorney General and Reporter

Janis L. Turner
Counsel for the State
Criminal Justice Division
Cordell Hull Building, Second Floor
425 Fifth Avenue North
Nashville, TN 37243-0493

Arthur F. Bieber
Assistant District Attorney General
204 Franklin Street, Ste. 200
Clarksville, TN 37040

OPINION FILED:_____

AFFIRMED

GARY R. WADE, JUDGE

<u>OPINION</u>

The defendant, John Jason Bakenhus, was indicted for aggravated arson, two counts of arson, three counts of civil rights intimidation, aggravated burglary, theft of property over five hundred dollars and theft of property under five hundred dollars. The jury returned guilty verdicts on all nine counts. The trial court imposed a Range I, effective sentence of twenty-two and one-half years and ordered restitution in excess of $65,000. The defendant was convicted for the same acts in federal court. The state and federal sentences are to be served concurrently.

In this appeal of right, the defendant presents the following issues for our review:

> (I)      whether the evidence is sufficient to support a verdict for aggravated arson;
>
> (II)     whether the trial court erred by admitting a photograph of a swastika and a sketch of a Klu Klux Klan lynching; and
>
> (III)    whether the indictments in counts VII, VIII and IX contain a material variance that warrants their dismissal.

We find no error and affirm the judgment of the trial court.

During the early morning hours of August 4, 1994, James L. Johnson and his family were awakened by a loud noise. Johnson told his wife to call 911, got a gun, and went to investigate. When he opened his front door, Johnson discovered his garage on fire and then noticed someone in a small white car drive by several times. Sometime after daylight, Johnson discovered melted siding and burned shutters. He found broken liquor bottles in the flower bed and smelled gasoline or diesel fuel. Johnson found a hate letter in his mailbox and noticed eight or ten small

2

holes in his front gutter, which appeared to be caused by a shotgun blast.

Nine days later, Georgia O'Hara, who lives on the same road as Johnson, learned that there had been a fire at her residence. Firefighters and police were at the scene when she returned at about 9:00 P.M. The damage was extensive. An antique fish tank had been "shot out," and two television sets, valued at $400 and $300, had been stolen. The glass frame in which she kept a photograph of her adopted son was smashed.

On the same day, Robert Smith, a local newspaper photographer, received an anonymous phone call. The caller claimed that "A.F." was responsible for burning a house and that if the "n----- in the area didn't get out of the area, then he was going to kill them all."

On August 18, 1994, Vester Lee Carney, the president of an organization comprised wholly of African-Americans, learned that their historic meeting lodge was fully engulfed in flames. The building was completely destroyed. The picnic pavilion was marred with spray-painted racial slurs. The charter and historic photographs of former members had been damaged and discarded outside the building. A kerosene heater valued at eighty dollars was stolen from the lodge.

Brian Beuscher was introduced to the defendant in late July of 1994 by a mutual friend Charles Neblett. Beuscher recalled that the defendant, then twenty-one years old, was attempting to organize a group which would conduct acts of violence against African-Americans and Hispanics in return for payment. Beuscher, age sixteen at the time, signed an oath and joined the group. Five other members between the ages of fourteen and sixteen were also recruited by the defendant.

3

Beuscher testified that on August 4, 1994, he, Neblett, and the defendant prepared Molotov cocktails by filling liquor bottles with gasoline and inserting a cloth wick. They also had ski masks and gloves, a shotgun, the Molotov cocktails, and a note Beuscher had written at the direction of the defendant: "Dear Johnsons, A.F. wants you to leave our white community! You coons! Coon hunting season is open! A.F." At about midnight, they left in Neblett's truck. Beuscher testified the defendant provided instructions. They parked at a cemetery about one hundred feet from the Johnson residence, put the note in the Johnson's mailbox and fired the shotgun at his residence. Neblett threw two lighted Molotov cocktails at the house and hit the attached garage. The defendant remained in the truck. Afterward the three men returned to the defendant's house, got in his vehicle, and returned to the Johnson residence to observe what they had accomplished.

Over the next few days, Beuscher met with the defendant to review plans for their next "mission" which targeted another house on the same road. He recalled that the defendant drew a layout of the house and discussed stealing items to sell. Beuscher testified that the defendant planned to pour out a gallon of gasoline in the residence rather then using Molotov cocktails. On the date of the O'Hara fire, Beuscher and the defendant, using ski masks and gloves, and armed with a shotgun and pistol, drove the defendant's vehicle to a place near the residence. Beuscher remembered knocking on the front door and that no one answered. He testified that the defendant kicked in the back door and directed Beuscher, who was armed with a pistol, to enter first. The defendant also entered the residence and instructed Beuscher to steal the television set from the living room. The defendant fired his shotgun into a fishtank then directed Beuscher to steal a second television set. Beuscher asserted that the defendant then poured gasoline throughout the kitchen and living room, breaking glass figurines and a

4

framed photograph that hung by the front door. Beuscher claimed neither had ignited the fire but acknowledged that the house was burning. Beuscher and the defendant fled the scene, hid the television sets, and concealed their gloves and masks in the defendant's briefcase. Beuscher denied preparing Molotov cocktails for this arson and said he did not know how the two empty liquor bottles ended up in the O'Hara house.

A few nights later, the defendant asked Beuscher to participate in a third arson which targeted the Great Benevolent Lodge. Beuscher refused, explaining that he was tired. He testified that the defendant admitted he and Neblett had burned the lodge. Beuscher acknowledged that he helped the defendant pawn a kerosene heater stolen from the lodge and one of the televisions stolen from the O'Hara residence.

Detective Clifton Smith of the Montgomery County Sheriff's Department investigated the Johnson fire. He found broken liquor bottles, a piece of cloth from the flower bed which smelled like gasoline or petroleum, and a shotgun wadding from a number eight shell. The Johnsons provided Detective Smith with the hate letter.

Detective Smith also investigated the O'Hara fire. He found two unbroken liquor bottles, cloth wicks which smelled of petroleum, an antifreeze jug, and a number six Winchester shotgun shell. He recalled seeing a number of broken figurines, the shattered fishtank, and a smashed photograph still hanging on the wall. The fire damaged the kitchen, bathroom, stairs and back door area.

A few days later, Detective Smith responded to the fire at the 110-

5

year-old Great Benevolent Lodge which was fully engulfed in flames. The magnitude of the fire prevented investigators from determining whether accelerants had been used. A nearby picnic shelter was defaced with racial slurs and the phrase, "A.F. Strikes Again."

Detective Smith testified that he connected the three incidents by the letter left in the Johnson mailbox, the anonymous phone call to the newspaper, and the graffiti at the lodge. He predicted that the next Saturday night another incident might occur, so he organized a stake-out. The defendant was stopped and consented to a search of his vehicle. Accelerants were discovered. Eventually, the defendant confessed. His statement led to the discovery of pawn tickets, a shotgun, number six and eight shells, and empty cans of spray paint.

Other officers found the defendant's briefcase from the garage of his father's house. It contained organization rules, regulations, oath, and a membership list. There were manuals on bomb making and war devices and a piece of paper listing types of grenades and explosives. Officers photographed a painting of a Nazi swastika on the wall of the defendant's bedroom. The defendant provided investigators with a small notebook containing hand drawings of a hooded KKK member lynching a man.

In his statements to Detective Smith, the defendant denied having animosity toward African-Americans but acknowledged that he despised interracial marriages. Although he initially denied membership in an extremist organization, he inquired whether Detective Smith had found a note in a mailbox, whether anyone had called the newspaper, and whether any graffiti had been found on a roadway or building. Detective Smith reviewed the membership list, contacted and interviewed

6

the members, and finally confronted the defendant who then admitted his guilt.

The defendant confessed to Detective Smith that he had instructed Beuscher to write the note and to shoot at the Johnson house. He also admitted providing Molotov cocktails to Neblett to throw at the house. He acknowledged his involvement in both the O'Hara and lodge fires. The defendant conceded that he had entered the lodge, lit some paperwork, and helped Neblett paint racial slurs on the picnic shelter. The defendant admitted having another member make the anonymous telephone call to the newspaper and informed Detective Smith that "A.F." were initials for the Aryan Faction.

A fingerprint expert, Paul Llewellyn, Jr., testified that the fingerprints on the papers found in the briefcase matched those of the defendant. John McOwen, a forensic chemist, found that the liquor bottles, wicks and gasoline mixture at the Johnson residence were consistent with those similar items discovered at the O'Hara residence. His tests also confirmed the presence of gasoline in the antifreeze jug recovered from her home.

I

Initially, the defendant claims that the evidence was insufficient for the aggravated arson because he was "not present" when the Johnson residence was burned. The defendant contends that he is guilty only of facilitation to commit a felony for the acts of Beuscher and Neblett.

On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the

7

witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983); Tenn. R. App. P. 13(e).

A person "who knowingly damages any structure by means of a fire or explosion ... [w]ithout the consent of all persons who have a possessory, proprietary or security interest therein" commits arson. Tenn. Code Ann. § 39-14-301. Aggravated arson is arson committed "[w]hen one or more persons are present therein." Tenn. Code Ann. § 39-14-302. "'Knowing' refers to a person who acts knowingly with respect to the conduct or circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). A person is held criminally responsible for the conduct of another when:

> Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]

Tenn. Code Ann. § 39-11-402(2).

There was proof that the defendant organized Aryan Faction, recruited members, and eventually provided Beuscher with a shotgun. There was testimony that the defendant formulated the content of the hate letter left in the Johnson mailbox. The defendant provided the materials and helped assemble the Molotov

8

cocktails. He gave Beuscher and Neblett instructions for the crimes against the Johnsons. There was proof that he watched the commission of the crimes from only a hundred feet away. Molotov cocktails were thrown against the brick wall of the garage while the Johnsons were inside sleeping. In our view, the evidence was sufficient to show that while Neblett committed the aggravated arson, the defendant shared in his intent, directed his actions, and aided in completion of the offense. Because there was adequate proof that the defendant was criminally responsible for Neblett's conduct, the evidence is sufficient to support the conviction for aggravated arson.

II

The defendant next complains that the trial court erred by admitting into evidence a sketch and a photograph of a painting because the prejudicial effect of these exhibits outweighed their probative value. The state argues that the exhibits were admissible to show intent to intimidate, an element of the offense of civil rights intimidation. The trial judge ruled that the exhibits were admissible to prove the defendant's intent to intimidate based on racial prejudice and to show the defendant's connection to Aryan Faction. These exhibits are best described as follows:

> Exhibit 43:   A poster-size, rectangular painting of a
>               black swastika in a white circle on a red
>               background resembling the Nazi flag;
>
> Exhibit 44:   A crude 5 x 7 inch sketch in red ink
>               depicting a Klu Klux Klan member in hood
>               and robe gesturing toward a man hanging
>               by a noose from a tree.

The admissibility of this evidence is governed by Tenn. R. Evid. 403. See also State v. Banks, 564 S.W.2d 947 (Tenn. 1978). "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the

9

danger of unfair prejudice, confusion of the issues, or misleading the jury ...." Tenn. R. Evid. 403. The evidence must be relevant and its probative value must outweigh any prejudicial effect. Banks, 564 S.W.2d at 950-51. Relevant evidence "means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Whether to admit the photograph or sketch is within the discretionary authority of the trial court and will not be reversed absent a clear showing of an abuse. State v. Dickerson, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993); State v. Allen, 692 S.W.2d 651, 654 (Tenn. Crim. App. 1985).

When questioned by Detective Smith, the defendant denied harboring racial animosity toward African-Americans. He initially denied membership in any extremist group. The crime of civil rights intimidation requires a showing by the state that the defendant damaged, destroyed, or defaced real property "with the intent to unlawfully intimidate another because that other exercised a right or privilege ...." Tenn. Code Ann. § 39-17-309(b)(4). The General Assembly declared that the citizens of this state are afforded protection from "unlawful intimidation" regardless of their race. Tenn. Code Ann. § 39-17-309(a). In our view, the photograph and sketch are valuable to prove the defendant's intent to intimidate his victims because of their race. While we concede that the exhibits may be offensive and crude, any prejudice is outweighed by their significant probative value as to the charged offense. See, e.g., United States v. McInnis, 976 F.2d 1226 (9th Cir. 1992) (holding that under Fed. R. Evid. 403, exhibits portraying swastikas and racial slurs were properly admitted to prove racial animus, an element of 42 U.S.C. § 3631(a), use of force to interfere with housing rights on account of race).

III

The defendant contends that Counts VII, VIII and IX contain material variances and must be dismissed.  The indictments allege as follows:

> SEVENTH COUNT:
> [T]hat on the 13th day of August, 1994, ... [the defendant] ... unlawfully, feloniously and knowingly did commit arson ... by knowingly damaging a structure, to wit: Great Benevolent Lodge 210 ....
>
> EIGHTH COUNT:
> [T]hat on the 13th day of August, 1994, ... [the defendant] ... unlawfully and knowingly did obtain ... a kerosene heater, under the value of Five Hundred ($500.00) Dollars, property of Great Benevolent Lodge 210 ....
>
> NINTH COUNT:
> [T]hat on the 13th day of August, 1994, ... [the defendant] ... unlawfully, knowingly and feloniously did damage real property of members of Great Benevolent Lodge 210, with the intent ... to unlawfully intimidate said members ....

The proof at trial was that the defendant committed these crimes on August 18, 1994.  The state contends that the variance is not material.

The provisions of both the Federal and Tennessee Constitutions guarantee the criminally accused knowledge of "the nature and cause of the accusation." U.S. Const. amend. VI; Tenn. Const. art. I, § 9.  In order to comply with these constitutional guidelines, an indictment or presentment must provide notice of the offense charged, adequate grounds upon which a proper judgment may be entered, and suitable protection against double jeopardy.  State v. Pearce, 7 Tenn. 65, 67 (1823);  State v. Byrd, 820 S.W.2d 739 (Tenn. 1991); Tenn. Code Ann. § 40-13-202.  A variance between the indictment and the evidence presented at trial is not fatal unless it is both material and prejudicial,  State v. Moss, 662 S.W.2d 590 (Tenn. 1984), thus affecting the substantial rights of the accused.  State v. Mayes, 854 S.W.2d 638, 639-40 (Tenn. 1993) (citing Berger v. United States, 295 U.S. 78,

11

82 (1935)).  A variance is not material where the indictment and the proof substantially correspond, the defendant is not misled or surprised at trial, and the defendant is protected from a second prosecution for the same offense.  <u>Moss</u>, 662 S.W.2d at 592.  "Unless a special date is essential or time critical to the case, the time of an offense alleged in the indictment is not material."  <u>State v. Hardin</u>, 691 S.W.2d 578, 580 (Tenn. Crim. App. 1985) (citing <u>State v. Fears</u>, 659 S.W.2d 370 (Tenn. Crim. App. 1983)).  In <u>Fears</u>, the defendant was charged with aggravated rape of the victim "on the _____ day of July, 1981."  The evidence presented at trial, however, did not establish that the offense occurred in July.  A panel of this court held that the variance was not material:

> Since time is not an essence of the offense and time will not bar the commencement of prosecution of this offense, the time of the commission of the offense averred in the indictment is not material, and proof is not confined to the time charged.

<u>Fears</u>, 659 S.W.2d at 374 (citations omitted).


The defendant was adequately informed of the charges he had to defend and was, in our view, sufficiently protected against a second prosecution for those offenses.   The date of the offense was not particularly material and did not handicap the defendant in the preparation or trial of his case. Because there is only one Great Benevolent Lodge 210 to be destroyed in August of 1994, the variance in dates should not have been a surprise.  The proof substantially corresponded with the indictment.


Accordingly, the judgment of the trial court is affirmed.


_____
Gary R. Wade, Judge


12

CONCUR:

_____
William M. Barker, Judge


_____
Curwood Witt, Judge