# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

FILED

**August 5, 1998**

**Cecil W. Crowson**
**Appellate Court Clerk**

TRACY RENEE MIGLIN,     )
                              )
    Plaintiff/Appellee,     )
                              )     Appeal No.
                              )     01-A-01-9707-CH-00362
VS.                       )
                              )     Maury Chancery
                              )     No. 95-725
DANIEL WALTER MIGLIN,     )
                              )
    Defendant/Appellant.     )

APPEALED FROM THE CHANCERY COURT OF MAURY COUNTY
AT COLUMBIA, TENNESSEE

THE HONORABLE JIM T. HAMILTON, JUDGE

BARBARA J. WALKER
22 Public Square
P. O. Box 1574
Columbia, Tennessee 38402-1574
    Attorney for Plaintiff/Appellee

LOUISE R. FONTECCHIO
2075 First American Center
315 Deaderick Street
Nashville, Tennessee 37238-2075
    Attorney for Defendant/Appellant

AFFIRMED AS MODIFIED
AND REMANDED

BEN H. CANTRELL, JUDGE

CONCUR:

TODD, P.J., M.S.
KOCH, J.

# O P I N I O N

The husband in this divorce case challenged almost every aspect of the trial court's orders, including child custody, alimony, the division of marital property and the terms of an injunction imposed to prevent him from interfering with the wife's authority over the children. We modify the injunction because we believe that its provisions are overbroad. In all other respects, we affirm the trial court.

## I.

The parties married on March 17, 1989. It was the first marriage for Daniel Walter Miglin, but appellee Tracy Renee Miglin had been previously married to Gary Driskell. A child, Kyle Driskell had been born of that marriage. Mrs. Miglin had been granted physical custody of Kyle, and was receiving child support from her former husband.

Two children were born of the marriage of Daniel and Tracy Miglin: Jason Daniel Miglin was born on August 8, 1990, and Logan Andrew Miglin was born on August 17, 1993. The testimony in this case (including the testimony of Mrs. Miglin) indicates that Mr. Miglin was a loving and devoted father to his children and had a good relationship with Kyle. However Mrs. Miglin's testimony also indicates an abusive and vindictive side to her husband's character that brings into question his suitability as a primary custodian for impressionable children.

Tensions within the marriage, which allegedly found expression in a pattern of continual spousal abuse by the husband led the parties to separate, and

upon the application of Mrs. Miglin, the court filed an Order of Protection and Temporary Support on November 7, 1995. The order was dissolved by mutual consent on December 8, 1995, and the parties attempted to resume their life together.

Problems arose almost immediately, allegedly because Mr. Miglin resumed his earlier pattern of threats and verbal abuse directed against his wife. On December 27, 1995, Tracy Miglin filed a Complaint for Divorce, and asked for custody of the children and for an Order of Protection. She claimed that her husband had physically abused her on Christmas Eve, had cursed her in front of the children, and had threatened to seriously harm her. The court issued a Temporary Restraining Order, forbidding Mr. Miglin from "coming about, harming, bothering, or molesting" his wife or children. "Wherever they might be."

The husband answered the divorce complaint on January 5, 1996, asking that it be dismissed. He denied the wife's allegations, and also advanced the affirmative defense of condonation to any acts he may have committed before December 8, 1995. His answer included a claim that his wife was guilty of inappropriate marital conduct, and that any ill conduct on his part was justifiably caused by the wife's conduct.

After a hearing, the court modified the Protective Order to allow scheduled visitation by the husband, and ordered him to pay alimony and child support pendente lite. On April 19, 1996, the husband counter-claimed for divorce, again claiming inappropriate marital conduct by the wife, and stating that he was "the fit and proper person to have care, custody and control of the minor children."

The issues were joined at a hearing on April 26, 1995. The parties stipulated that the Court could declare the parties divorced rather than awarding divorce to either party. The final decree, issued on May 7, 1996, granted both parties

an absolute divorce pursuant to Tenn. Code Ann. § 36-4-129. Tracy Miglin was granted child custody, and a visitation schedule was created for Daniel Miglin.

The court divided the marital property, granting the marital home to Tracy Miglin, and a vacant lot adjoining the marital home to Daniel Miglin. Mr. Miglin was also ordered to pay child support based on his 1995 income, in accordance with the guidelines, alimony of $300 per month, and one-half of the wife's attorney fees. The court stated that it could not risk lifting the Temporary Restraining Order and made it permanent. The husband subsequently filed a Notice of Appeal, which this court dismissed without prejudice for lack of finality, because the amount of attorney fees had not been determined.

On June 18, 1996, Tracy Miglin filed a Petition for Contempt, claiming that despite the permanent restraining order, her husband had continued to "come about, harm, bother, molest and interfere with the Petitioner by following and spying on [her]," that he mouthed obscenities to her in front of the children, and that he was spending an unreasonable amount of time on the lot next door, causing much turmoil in the relationship between mother and children.

At the subsequent hearing, the wife elaborated on the allegations in her Petition, and also claimed that Daniel Miglin followed her and the children on the street and at the Food Lion store where she shopped for groceries. The court's order of September 3, 1996 found Mr. Miglin not to be in willful contempt, but enjoined him from going on his lot, except for one day a week to mow the grass. He was prohibited from shopping at the Food Lion and from driving on the street where the marital home was located, except for the purpose of picking up or returning the children for visitation. His telephone contact with the children was also restricted. Mr. Miglin then filed a timely notice of appeal.

The parties filed several subsequent pleadings, including another petition for contempt by Tracy Miglin, and a petition by Daniel Miglin to reduce the amount of child support and to reduce or terminate the alimony, due to a change of circumstances. After hearings, the trial court made some relatively minor modifications in the visitation schedule and the terms of the restraining order, but did not find Mr. Miglin in contempt. The court refused to terminate the alimony, and increased Mr. Miglin's child support obligation on the basis of his 1996 income. On July 21, 1997 Mr. Miglin filed another Notice of Appeal, asking for a review of all the trial court's orders to date.

## II.  Child Custody and Evidentiary Questions

The issues the appellant has raised on appeal are (1) whether the trial judge erred in his custody determination by failing to apply the appropriate factors to the judicial doctrine of comparative fitness, and by excluding possibly probative evidence as to the fitness of the parties; (2) whether there was sufficient proof to justify the award of alimony and attorney fees; (3) whether the division of marital property was equitable; and (4) whether the court abused its discretion in enjoining the defendant from the use and enjoyment of his property, and the use of public streets and stores. We will examine each of these issues in turn.

Our Legislature has given the courts the authority to award child custody in an action for dissolution of a marriage "to either of the parties to the suit, or to both parties in the instance of joint custody or shared parenting, or to some suitable person, as the welfare and interest of the child or children may demand . . . ." Tenn. Code Ann. § 36-6-101(a).

The courts have underlined the importance of making a correct determination in custody matters, stating in one case that "neither trial nor appellate

judges have any responsibility greater than to attempt to correctly adjudicate child custody disputes." *Bah v. Bah*, 668 S.W.2d 663, 665 (Tenn. App. 1983).

Such a determination must be based first and foremost on the best interest of the child or children, and can involve consideration of a multitude of factors that can affect the child's best interest. *See Nichols v. Nichols*, 792 S.W.2d 713 (Tenn. 1990), *Rogero v. Pitt*, 759 S.W.2d 109 (Tenn. 1988).

In the *Bah* case, the court adopted the doctrine of comparative fitness to replace the "tender years doctrine," which had created an almost unshakeable presumption that the mother was the most suitable custodian for children of tender years. According to *Bah*,

> "Fitness for custodial responsibilities is largely a comparative matter. No human being is deemed perfect, hence no human can be deemed a perfectly fit custodian. Necessarily, therefore, the courts must determine which of two or more available custodians is more or less fit than others . . . . To the extent the 'tender years' doctrine has continued efficacy it is simply one or many factors to be considered in determining custody, not an unyielding rule of law. The only rigid principle is and must be that the best interests of the child are paramount in any custody determination."

668 S.W.2d at 666.

In the present case, the trial judge did not state the reasons behind his conclusion that "it would be in the best interest of said children that their exclusive custody be granted to the plaintiff, with the defendant being granted visitation rights." The appellant argues on appeal that the trial court's order indicates that it failed to consider the relevant factors and subject them to comparative fitness analysis.

The appellant further argues that since the divorce decree and subsequent orders contain no specific findings of fact, review in this court is de novo, without the presumption of correctness accorded such findings by Tenn. R. Civ. P.

13(d). We do not accept the appellant's position without reservations, but even without applying the presumption of correctness, we think the evidence preponderates in favor of the court's conclusion.

Mr. Miglin presented quite a few witnesses who had been able to observe his interactions with his children. They all testified that he took a great deal of pleasure in their company, that he was very involved in their care, and that they responded well to him. He complains that Mrs. Miglin did not present very much testimony about her parenting skills. While she stated that she "lived for my kids," she did not detail why she believed herself to be the more fit parent.

However she did testify consistently and in detail that Mr. Miglin had been continually abusive towards her, and that the children had witnessed at least some of this conduct. Her testimony included incidents of physical abuse, threats of extreme violence, the utterance of insults and obscenities directed towards her, and the silent mouthing of these same insults and obscenities when he became aware that she might be taping him to create a record of his behavior. She also testified that the children were difficult to discipline after returning from visitation with the father, and that the youngest child (two and a half years old at the time of trial) had acquired the habit of cursing and using obscenities when he became angry.

It is the view of this court that it is in the best interest of the children that they be given the opportunity to maintain warm and close relationships with both parents. In view of the history of this case, and the disturbing testimony as to Mr. Miglin's behavior, we believe that granting custody to him would have the effect of undermining the children's relationship to their mother. We also note that Mr. Miglin has a full-time job, and that he admitted to the court that he had no plan as to how he would care for the children if he were granted primary custody.

The appellant ascribes error to two evidentiary rulings by the trial court relating to the question of custody, and we will address these now. Mr. Miglin offered into evidence the telephone deposition of Gary Driskell, Mrs. Miglin's first husband, for the purpose of proving that Mrs. Miglin had attempted to alienate Kyle's affection from his father.

The appellee objected, and the trial court declined to admit the deposition into evidence, apparently because it was not filed with the court at least 72 hours before the scheduled trial, as is required by Rule 22 of the Local Rules of the Twenty-Second Judicial Circuit. The appellant could have made an offer of proof at the point when the trial court refused to admit the deposition, but did not do so.

Trial courts have the right to adopt and enforce local rules of procedure, so long as these rules are not inconsistent with the Rules of Civil Procedure and the Rules of Criminal Procedure. See Rule 18, Rules of the Supreme Court. Though the appellant points out that the deposition in question was taken in accordance with the Rules of Civil Procedure, there is nothing in those rules that prevents the trial court from enforcing local rules in regard to the filing of such depositions with the court.

But even if the local rule were invalid or inapplicable under the circumstances, we would still have no basis upon which to reverse the trial court on this issue. Rule 403 of the Rules of Evidence permits the trial court to exclude relevant evidence if its probative value is substantially outweighed by "considerations of undue delay, waste of time, or needless presentation of cumulative evidence." We note that the record contains testimony by Mr. Miglin's sister as to interactions she observed between Gary Driskell and Renee Miglin which are consistent with Mr. Miglin's theory, and which thus raise an inference that the deposition testimony would have been merely cumulative. However, in the absence of an offer of proof, and the resulting exclusion of the deposition from the technical record, this court cannot

consider whether the deposition was properly excludable under Rule 403 or any other rule of evidence. *See Davis v. Hall*, 920 S.W.2d 213 (Tenn. App. 1995). *See also* Rule 103(a)(2), Tenn. R. Evid.

The appellant also ascribes error to the trial court's refusal to allow the children to testify. He argues that since Mrs. Miglin testified that her husband had been abusive to her in front of the children, and Mr. Miglin denied this, testimony by the children themselves was necessary to determine the truth of the allegations. In the alternative, the appellant argues that the trial court should have appointed a guardian ad litem to investigate the circumstances of the children and to report to the court on their behalf.

The trial court has broad discretion in determining whether to take the testimony of a minor child. *State v. Fears*, 659 S.W.2d 370 (Tenn. Crim. App. 1989). Apparently the court was satisfied with Mrs. Miglin's credibility. In view of the ages of the Miglin children (five and a half, and two and a half) and the age of Kyle Driskell (nine) we do not believe that the judge abused his discretion in declining to allow them to testify.

### III. Alimony and Attorney Fees

Our Legislature has set out twelve factors for trial court to consider in determining alimony awards. Tenn. Code Ann. § 36-5-101. Most (but not all) of these factors relate to the economic circumstances of the parties, for the desired effect of alimony is to redress the economic inequities that arise upon divorce. Our courts have stated that need and ability to pay are the most critical factors for the court to consider. *Lancaster v. Lancaster*, 671 S.W. 2d 501 (Tenn. App. 1984); *Loyd v. Loyd*, 860 S.W.2d 409, 412 (Tenn. App. 1993).

Both parties in the present case have submitted sworn statements of income and expenses. Tracy Miglin also submitted a sworn statement of the parties' separate and joint assets and liabilities. Analysis of these documents reveals that an income that was probably ample for a household of five individuals is barely adequate when that household is split by divorce.

The proof shows that Tracy Miglin's employment opportunities have been limited by her duties as a homemaker and parent. However, she works part-time as a waitress, earning about $390 per month. Although she has an Associates (two-year) degree, she has chosen waitressing because it enables her to adjust her schedule to work only when the children are being taken care of by a babysitter, or Mr. Miglin is exercising his visitation privileges. She also receives about $400 per month in child support from Gary Driskell.

Her statement of income and expenses shows total monthly expenses of $1984.08, which includes a mortgage payment of $601.58. Thus, even when the child support ordered in the original divorce decree ($1,097) was added to Mrs. Miglin's other income, she faced a monthly shortfall of about $100.

Daniel Miglin is a skilled auto worker, employed at the Saturn auto plant and earning $4,046 per month. After taxes and deductions, he nets $2,920. His monthly expenses (excluding alimony and child support, but including $510 in monthly rent) comes to $1,595. Adding his child support obligation to his expenses brings them up to $2,692.

As we stated above, the trial court ordered Mr. Miglin to pay alimony of $300 per month until August of 1998. The amount of alimony to be awarded lies within the discretion of the trial judge, and will not be modified absent abuse of that discretion. *See Rains v. Rains*, 58 Tenn. App. 214, 428 S.W.2d 650 (1968); *Franklin*

- 10 -

*v. Franklin*, 746 S.W.2d 715 (Tenn. App. 1987). Examining the economic circumstances of the parties in light of the factors enumerated in Tenn. Code Ann. § 36-5-101, we cannot say that the trial court abused its discretion, and we affirm the alimony award.

The trial court also granted Tracy Miglin one-half of her attorney fees, ordering Daniel Miglin to pay the sum of $2,665. The appellant insists this was error, because no testimony was presented about her inability to pay her own fees. However the sworn statement of the parties' separate and joint assets and liabilities clearly indicates that the wife did not have sufficient funds with which to pay her attorney.

Attorneys fees may properly be allowed as a part of alimony. *Raskind v. Raskind*, 45 Tenn. App. 583, 325 S.W.2d 617 (1959). Like alimony awards in general, such an award is within the sound discretion of the trial court, and the appellate court will not interfere except upon a clear showing of abuse of that discretion. *Elliott v. Elliot*, 825 S.W.2d 87 (Tenn. App. 1992). We see no such abuse here.

## IV. Property Division

The marital property included a home in Columbia, Tennessee, valued at $119,000, and two additional lots valued at $15,000 each, which adjoin the home on both sides. The husband had also accumulated assets in a Saturn savings plan and a Saturn retirement account that met the definition of marital property, because they were acquired during the course of the marriage. *See* Tenn. Code Ann. § 36-4-

121(b). The rest of the marital estate was comprised of two vehicles, and household goods with a modest valuation.

The trial court granted the wife the marital home, and made her solely responsible for the payments on the mortgage note, which had a balance of about $60,500. He gave one of the lots to the husband and one to the wife, and granted the husband the sole ownership of his savings, valued at $36,646, and his retirement account, valued at $17,812. Each of the parties was granted one of the vehicles, and the household goods were also divided. Thus the division of the marital property was roughly equal, with the husband stating that he received property with a total value of about $81,000, and that the wife received property worth about $93,000, including the value of the equity in the home.

The appellant argues that the trial court erred in the division of marital property, not because of inequality in the amounts awarded to each party, but because the wife obtained a home for her immediate use, while the husband was primarily given funds that he will not have access to for many years. He suggests that it would have been preferable to split both the equity in the home and the retirement account between the parties, so that a second mortgage could be placed on the home for his benefit, and he could thereby obtain funds for a down payment on a house. He complains that the lack of a down payment is forcing him to live in an apartment.

However we feel there is very little basis for this complaint. First, the Legislature has instructed the courts that in dealing with the marital home "special consideration" should be given to the spouse having physical custody of the children. Tenn. Code Ann. § 36-4-121(d). In addition, since he was also granted a lot adjoining the marital home, which has been valued at $15,000, we see no obstacle that prevents him from selling the lot, and thus acquiring his down payment. Such a sale would probably do much to alleviate the tension between the parties. Since Mr.

Miglin's use of that lot has been a source of so much disagreement, we can hardly fault the trial court for declining to create further opportunities for mischief by giving each of the parties ownership rights in the other's property.

## V.  The Injunction

In the hearing on her Petition for Contempt, Teresa Miglin testified that her former husband used his property in such a way as to intimidate her, and to interfere with her control and discipline over the children.  The record indicates that the appellant spends a lot of time on the property, cutting the lawn, planting flowers, building a toolshed, or hitting golfballs with a friend.  This activity naturally attracts the attention of his children, who come over to play and to see their father.

Tracy Miglin  testified that on one occasion when she came outside to tell the children to come in for dinner or bed, the appellant yelled at her, threatened her, and told her to get off his lot; that he has told her on 5-7 occasions in front of the children that if she comes on his property he will have her arrested; that when they are inside the house and he is on the lot, he calls them on his cellular phone to tell them to come out and see him.

She also testified that he mouthed obscenities to her while he was on the lot and she was on the porch or in the doorway of her home, that he stalked her at the Food Lion Store and followed her home, and that on her birthday, he parked in front of his lot after dark for about thirty minutes with his lights on.  She stated that she finds his presence on the lot threatening and intimidating.

Mr. Miglin denied most of the appellee's allegations, though he admitted he told her to get off his property.  He denied that he had ever stalked her, or that he had any sinister intentions towards her, and he offered an innocent explanation for all

the incidents where she felt he was following her or harassing her. We note, however, that once one person has been placed in fear by another, it does not necessarily take a very blatant act to reawaken the fear in the victim, and any deliberate attempt to reawaken that fear amounts to intimidation.

The trial court responded to Mrs. Miglin's concerns by issuing a very broad injunction, some of whose provisions were:

> 1. The Respondent is prohibited from going to his Lot 33 located at Clearbrook Court, Columbia, Tennessee except for one (1) day each week for the sole purpose of mowing the grass.
> 2. The Respondent is prohibited from being on Rutherford Lane except at those times when he is picking up or returning the children for his visitation privileges.
> . . .
> 4. The Respondent is prohibited from shopping at Food Lion, Trotwood Avenue, Columbia, Tennessee.

The courts possess broad powers to issue restraining orders and injunctions to preserve the peace and to prevent injury. *See* Rule 65, Tenn. R. Civ. P. We believe, however, that restraining orders should be drawn as narrowly as is possible to achieve their legitimate ends. While we appreciate the difficulty the trial court faced in trying to restrain the conduct of the appellant, totally barring him from public places and so severely limiting his use of his own property appears to us to be an excessive intrusion upon his liberty.

Appellee cites us to another case involving a restraining order, *Sitton v. Finley*, 743 S.W.2d 933 (Tenn. Crim. App. 1987), for the proposition that the order in question is not too restrictive. The restraining order in the *Sitton* case prohibited the plaintiff's ex-husband from using certain sections of four streets in Clarksville "for the purpose of harassing, intimidating or disturbing" his ex-wife." He admitted he had lingered on those streets, but claimed he had a legitimate reason for being there. The

court found that he was actually there for the purpose of harassment or intimidation, and ruled that he was guilty of contempt of court. The appeals court affirmed.

We believe that the present case can be distinguished from *Sitton*, because the restraining order in that case did not totally prohibit the defendant from frequenting the streets in question, but merely from using those streets to harrass the plaintiff at her home and place of business. Further, the appellant in *Sitton* was not challenging the validity of the restraining order, but merely the finding that it had been violated.

We believe that the trial court's order should be modified to eliminate clauses 1, 2 and 4, quoted above, but that the appellant should be enjoined from using his property in such a way as to harrass, intimidate or disturb the appellee or to interfere with her control over the children while they are in her custody. We also observe that the trial court has another tool available to influence the appellant's behavior, in its power to reduce the appellant's scheduled visitation in proportion to the amount of unscheduled visitation he exercises on his lot.

**VI.**

The judgment of the trial court is modified in regard to the injunction against the husband. In all other respects it is affirmed. Remand this cause to the Chancery Court of Maury County for further proceedings consistent with this opinion. Tax the costs on appeal equally between the appellant and the appellee.

_____
BEN H. CANTRELL, JUDGE

- 15 -

CONCUR:


_____
HENRY F. TODD, PRESIDING JUDGE
MIDDLE SECTION


_____
WILLIAM C. KOCH, JR., JUDGE