IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 23, 2003

## STATE OF TENNESSEE v. TAMMY HART

**Direct Appeal from the Criminal Court for Johnson County**
**No. 3512      Robert E. Cupp, Judge**

**No. E2003-00053-CCA-R3-CD**
**November 7, 2003**

The Johnson County Grand Jury indicted the Defendant, Tammy Hart, for child endangerment, vehicular homicide, and aggravated vehicular homicide after the Defendant's car collided "head-on" with another car, killing the other driver. A Johnson County jury convicted the Defendant of child endangerment and vehicular homicide. The Defendant waived her right to a jury trial on the third count of the indictment, and the trial court found the Defendant guilty of aggravated vehicular homicide and merged the vehicular homicide conviction with the aggravated vehicular homicide conviction. The trial court sentenced the Defendant to eleven months, twenty-nine days for child endangerment, all of which was suspended except for thirty days, and twenty-three years for the aggravated vehicular homicide conviction and ordered the sentences to run consecutively. On appeal, the Defendant contends the following: (1) that the trial court erred by denying the Defendant's motion to suppress her medical records; (2) that the trial court erred in admitting the Defendant's medical records into evidence; (3) that the Defendant's constitutional right of confrontation was violated by the admission of her medical records into evidence; and (4) that the evidence presented at trial was insufficient to sustain her convictions. Finding no reversible error and concluding that sufficient evidence exists in the record to support the Defendant's convictions, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and JAMES CURWOOD WITT, JR., JJ., joined.

Thomas McKinney, Jr., Kingsport, Tennessee, for the appellant, Tammy Hart.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; Brent C. Cherry, Assistant Attorney General; Joe C. Crumley, Jr., District Attorney General; Ken Baldwin and Tony Clark, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION
## I. Facts

This case arises from the death of the victim, Catherine Triplett, after the Defendant's car collided "head-on" with the victim's car on Cold Springs Road in Johnson County on December 16, 1999. The Defendant's minor child was in the front passenger seat of the Defendant's car at the time of the collision. The Johnson County Grand Jury indicted the Defendant for child endangerment, vehicular homicide, and aggravated vehicular homicide. The Defendant was tried on December 10, 2001 in the Johnson County Criminal Court, and a jury convicted the Defendant of vehicular homicide and child endangerment on the next day. Thereafter, the Defendant waived her right to a jury trial on the aggravated vehicular homicide indictment, and the trial court found the Defendant guilty of this offense and merged the vehicular homicide conviction with the aggravated vehicular homicide conviction. The trial court then sentenced the Defendant to eleven months, twenty-nine days for child endangerment, all of which was suspended except for thirty days, and twenty-three years for aggravated vehicular homicide, and ordered that the sentences run consecutively. The Defendant now appeals.

## A. Suppression Hearing

The following evidence was presented at the suppression hearing held in response to the Defendant's motion to suppress her medical records. The parties stipulated at the hearing that following the collision, medical personnel flew the Defendant by helicopter to Johnson City Medical Center, a "duly licensed health care facility," for treatment. The parties also stipulated that Rick Spivey, the Defendant's former attorney, had no knowledge or notice of the subpoena for the Defendant's medical records until the preliminary hearing and did not consent to the release of those records to the State. Further, the parties stipulated that the State did not obtain a search warrant for the Defendant's medical records.

Trooper Dexter Lunceford of the Tennessee Highway Patrol testified that he investigated the two-car collision involving the Defendant and the victim. Trooper Lunceford stated that he suspected that the Defendant was intoxicated at the time of the collision, so he requested a subpoena duces tecum from the Johnson County Circuit Court Clerk, Carolyn Hawkins, to obtain the Defendant's medical records. The State then introduced a copy of the subpoena for the medical records into evidence. Trooper Lunceford testified that he took the subpoena to the Johnson City Medical Center and served the subpoena on the medical records department. He stated that the medical records department then gave him the Defendant's medical records "a few minutes" after he served the subpoena. Trooper Lunceford testified that after reviewing the medical records himself and making them part of the permanent vehicular homicide report, he gave a copy of the Defendant's medical records to the Johnson County District Attorney General's Office. He explained that the medical records contained a toxicology report showing that the Defendant's blood alcohol level was 0.178 at the time of the test. Trooper Lunceford testified that he did not obtain a second blood alcohol test because the hospital's blood-alcohol test was accurate and was given closer to the time

of the collision. On cross-examination, Trooper Lunceford testified that he did not obtain the Defendant's permission to get her medical records from Johnson City Medical Center.

The Defendant testified at the suppression hearing that she did not give anybody permission to review her medical records or obtain copies of her medical records. After this evidence was presented, the trial court denied the Defendant's motion to suppress her medical records because it found that Trooper Lunceford did not violate the Defendant's right to privacy by obtaining the records from the hospital and that the medical records were admissible as business records under Tennessee Rule of Evidence 803(6).

## B. Trial

The following evidence was presented at the Defendant's jury trial on two of three counts for which she was indicted. Jake Story, an emergency medical technician with the Johnson County Emergency Rescue Squad, testified that he responded to an automobile collision on Cold Springs Road on December 16, 1999, and arrived at the scene between 6:00 and 6:30 p.m. Story stated that the Defendant's car was in the middle of the road, and the Defendant was in the driver's seat and a child was in the back seat. He explained that the victim's car was off the road down in an embankment, with the nose of the car pointed up toward the road. Story testified that he and his rescue squad partner walked by the Defendant's car and spoke to her. He stated that the Defendant had her seatbelt on and seemed to be in good condition. Story explained that he and his partner then inspected the victim's car and determined that the victim needed medical attention first. Story testified that, as he was returning to the ambulance to get medical supplies for the victim, the Defendant came out of her car and told him that she was having chest pains. Asked whether he smelled the odor of alcohol on the Defendant, Story responded, "I wouldn't swear that it was alcohol, but, there was a smell of something that–that was there; you know, as far as alcohol I can't . . . pinpoint it down to alcohol." He stated that he told another emergency medical technician at the scene about the Defendant's condition, and the other technician attended to her. Story testified that he retrieved the required medical supplies from the ambulance for the victim and returned to his rescue squad partner who was treating the victim. He stated that a medical helicopter from Johnson City Medical Center landed close to the victim's car and then flew the victim to the medical center.

Story described the victim's car as "[d]estroyed, completely destroyed, bent all to pieces, and sheet metal, and bumper embedded into it . . . ." Story stated that the victim was unconscious when he and his partner found her in her car and that she never regained consciousness while he and his partner attended to her. He testified that he and his partner "[h]ad to cut [the victim] out using rescue tools, jaws, [and] even [had to hook] a wrecker to it and spread[] the floorboard open to get her feet out." On cross-examination, Story testified that both the Defendant and her son had their seatbelts on, but he could not remember whether the victim had her seatbelt on when he arrived at the scene. He also testified that he smelled the odor of anti-freeze all over the road from the impact of the vehicles. On re-direct, Story explained that he did not know what to call the odor he smelled on the Defendant when she spoke to him. He stated, "I really wasn't face-to-face with her. It was more of a arm's–a couple arm's reach. I couldn't pinpoint it was alcohol, or breath mint, whatever it was I

don't know."

Trooper Lunceford testified that, at the time of the trial, he had worked for the Tennessee Highway Patrol for thirteen years, and during six of those years he worked as an accident reconstructionist. Trooper Lunceford stated that he investigated between four hundred to five hundred collisions during his six years as an accident reconstructionist. Thereafter, the trial court declared Trooper Lunceford an expert in accident reconstruction. Trooper Lunceford described to the jury how he reconstructed the collision between the Defendant's car and the victim's car. He stated that he arrived at the scene of the accident at approximately 7:21 p.m., which was about an hour after the collision. Trooper Lunceford testified that both the victim and the Defendant had been taken to the Johnson City Medical Center by the time he arrived at the scene and that the dispatcher told him that this collision caused a fatality. Trooper Lunceford testified that, when he arrived at the scene, he located the Defendant's son, who was six years old at the time and was removed from the scene following the collision. Trooper Lunceford stated that he then began to mark the roadway to preserve the location of "short lived evidence," such as debris and the wreckage of the cars, because the debris had to be removed as quickly as possible to clear the road. He explained, "I marked the vehicles, marked the various points that were going to be pertinent to the investigation, the gouge marks, the skid marks; asked for witnesses, if anyone had [seen] it, could not find any." Trooper Lunceford testified that he called two wreckers to the scene to tow away the two wrecked cars and had the wrecker drivers sign forms to ensure that the cars would be kept in secured locations.

Trooper Lunceford testified that medical personnel at the scene told him that the Defendant had been taken to the Johnson City Medical Center for medical treatment. Trooper Lunceford stated that he left the scene at 8:24 p.m. and then arrived at the medical center at 9:11 p.m. He testified that once he arrived at the medical center, nursing personnel told him that the Defendant was in the X-ray department and that the victim had died. Trooper Lunceford explained that he wanted to talk with the Defendant to "[s]ee if she could tell me what happened, to confirm that she was the driver, any information that she may be able to tell me as to what had transpired, to see whether or not she may or may not [have] been under the influence." He stated that he found the Defendant in the X-ray department lying on a gurney. Trooper Lunceford testified that, after he approached the Defendant and ensured she was the Defendant, "I asked her if she . . . was driving the vehicle. She confirmed that. I asked her if she could tell me anything about what caused the accident." Trooper Lunceford testified that the Defendant responded, "No. I don't know what caused it, but, it wasn't my fault. . . ." He described the Defendant as follows: "Her speech was slurred, the characteristics of someone under the influence. Her eyes were red and bloodshot. And when I got within about five feet of her I could smell the ethyl alcohol." Trooper Lunceford testified that he smelled alcohol on persons many times throughout his career as a trooper. He stated that when he smelled the odor of alcohol on the Defendant, he asked her whether she had been drinking that night. Trooper Lunceford testified that the Defendant "said, yes, she'd had a couple of beers." He stated that he asked her again whether she remembered anything about the collision and the Defendant responded, "no." Trooper Lunceford explained that "at that point in my mind I developed her as a suspect in a vehicular homicide, and I Mirandized her." He stated that after reading the Defendant her rights, he did not ask her any more questions or take any statement from her that evening.

-4-

Trooper Lunceford testified that, in his opinion, the Defendant was intoxicated the night of the collision because of the Defendant's "mood changes," "[t]he odor of the alcohol, her slurred speech, bloodshot eyes, [and] her face was red." He stated that, as he questioned the Defendant, she was lying on a gurney "and sometime during our conversation she set up on one elbow a little bit." Trooper Lunceford testified that, based upon all the information he obtained from the Defendant and from the scene of the collision, he obtained the arrest warrant charging the Defendant with the vehicular homicide of the victim at 1:26 p.m. on December 17, 1999. He stated that he also obtained an arrest warrant charging the Defendant with child endangerment "for having someone under the age of thirteen in her vehicle while under the influence of alcohol or drugs." Trooper Lunceford testified that he did not ask the Defendant about her child when he questioned her at the hospital. He explained, "after I Mirandized her I said, 'are you going to talk to me?' and she just–she wouldn't. She just shook her head. She wouldn't talk to me anymore. . . ."

Trooper Lunceford showed the jury three computer diagrams of the collision scene that were drawn to scale and explained the details of each one. He showed the jury the location of the point of impact, which was in the victim's lane. He stated that the victim was driving in an easterly direction in the right lane, while the Defendant was driving in a westerly direction in the left lane. Trooper Lunceford testified that pre-impact skid marks left by the victim's car showed "[t]he direction of travel, the amount of time she had to react, which wasn't very much. It also tells you that she had somewhat of a braking deficiency. The right side locked before the left." He stated the skid marks also showed that the victim attempted to get as far right as she could to avoid the Defendant's on-coming car. Trooper Lunceford testified that he did not find any pre-impact skid marks or brake marks left by the Defendant's car. He explained:

> That tells me that [the Defendant] did not perceive any event getting ready to occur. She didn't react to anything. She didn't apply her brakes. She did not take any evasive steering. As you saw a vehicle coming at you in your lane of travel, you're going to apply your brakes, common sense with all drivers [is that] you're going to apply your brakes in fear. But, when you jerk your steering wheel you're going to leave a mark on the roadway, a yaw[1] mark. There were no skid marks, no yaw marks, no reaction whatsoever prior to impact.

Trooper Lunceford testified that the Defendant's car traveled 45.96 feet after the impact and came to a rest in the middle of the road. He stated that the point of impact was 10.17 feet beyond the center double line, in the victim's lane of travel. Trooper Lunceford testified that he calculated the speeds of the two cars at the time of impact by using the weights of the cars, the approach angles,

---

[1]Trooper Lunceford explained that:

A yaw mark is caused as a tire slips [and] slides, which is a common term used. When you apply your brakes and the tires . . . leave a mark on the roadway, but, as you're doing that, it's also slipping, and it's turning at the same time. . . . As the vehicle shifts to one side or the other, it will leave striations as the tires turn. And those striations will give the direction of travel. And it can also prove the speed. . . .

the departure angles, and the coefficient of friction, or drag factor, of the roadway surface. He stated that the Defendant was traveling sixty-six miles per hour at the time of the collision, while the victim was traveling thirty-two miles per hour at the point of impact. Trooper Lunceford testified that the posted speed limit on Cold Springs Road was forty-five miles per hour.

Trooper Lunceford testified that, in his opinion, the collision took place as follows:

[The victim] was eastbound on Cold Springs Road somewhere around the posted speed. . . . She reacted to something in her lane of travel because she applied her brakes. . . . And slowed and attempted to move to the right shoulder. In my opinion, [the Defendant] was traveling 66 miles per hour in a 45 miles per hour zone while under the influence of alcohol and drugs, crossed the center lane and struck the [victim's] vehicle head on . . . [c]ausing the death of [the victim].

Trooper Lunceford then identified the Defendant in the courtroom as the woman he talked with at the hospital and charged with vehicular homicide and child endangerment. On cross-examination, he stated that he did not know how much morphine was given to the Defendant while she was at the hospital and did not see an I-V "hooked up" to the Defendant. Trooper Lunceford acknowledged that morphine was a powerful pain killer and could have a sedative effect on the Defendant if she had received it. However, he stated that "[m]orphine does not smell like ethyl alcohol." Trooper Lunceford explained that "rubbing alcohol smells like rubbing alcohol. Ethyl alcohol smells like either liquor or beer, or mixture of the two." He stated that he had never seen a hospital use any ethyl alcohol, or drinking alcohol, in its emergency room. Trooper Lunceford admitted that it was possible that the Defendant's bloodshot eyes could have been caused by crying, but he stated that he believed that the Defendant was intoxicated at the time of the collision. He testified that he did not give the Defendant any field sobriety tests, rather he formed the opinion that she was intoxicated based upon the Defendant's appearance and what she told him at the hospital. Trooper Lunceford acknowledged that the Defendant may not have remembered the collision at the hospital due to a concussion. He testified that there was no doubt in his mind that he smelled the odor of alcohol on the Defendant when he questioned her at the hospital, and he described the odor in his notes at the time as an "obvious odor of intoxicant." Trooper Lunceford explained that he was four feet away from the Defendant when he smelled the odor of alcohol.

Jane McKee, Director of Medical Records at Johnson City Medical Center, testified that medical records at the medical center were maintained in the course of the hospital's business. She stated that the medical records were made during the routine course of medical treatment at the hospital, and were made at or near the time that the medical treatment was administered to patients. McKee testified that Johnson City Medical Center's policy was to make medical records for all patients treated at the hospital to record what type of medical treatment the patients received and when it was received. McKee stated that the hospital kept medical records for emergency room patients as well as those who stayed in the hospital for other forms of medical treatment. She testified that she had the medical records of the Defendant that were generated as a result of the Defendant being brought to the medical center on December 16, 1999. McKee also stated that she

had the medical records of the victim for that same date. The trial court then unsealed both sets of records and marked them as exhibits. At a bench conference, defense counsel objected to the admission of the medical records into evidence "because, you know, my objection goes to the proper identification of these, and to the chain of custody issues." The trial court overruled the objection, stating:

> For the record, under Rule 803(6), . . . I think the state followed procedure and established that she was the appropriate custodian of the records. They're admitted. Also, a section . . . 68-11-401, that also allows the admission of those with one exception. And it was a previous thing I had some problems with and that was where that you could do it by affidavit, and the higher courts have held that that affidavit is insufficient. So, they can proceed, and it's admissible under both of those sections.

Dr. Ellen Wallen, a forensic pathologist, testified that she performed an autopsy on the victim on December 17, 1999. After stipulations from the State and the Defendant, the trial court declared Dr. Wallen an expert in forensic pathology. Dr. Wallen testified that the cause of the victim's death was "multiple blood traumatic injuries." She stated that the victim had the following injuries:

> She had injuries to her neck, the cervical verebrae, two and three, the second vertebra down from the top of her head. They were actually broken and separated. And she had a separation of the sternum and clavicle on the right side where I'm pointing on my body. She had multiple rib fractures, and her lungs were collapsed, and she had . . . multiple pelvic fractures. And she had fractures of both femurs, her left patella, . . . the left knee cap, then in both bones of the left leg below the knee.

Dr. Wallen testified that the victim's death "certainly could have been very rapid. It could have taken a little bit of time, but, . . . it wasn't days . . . it was a matter of minutes, if not faster." She explained that the victim's injuries were consistent with having been in a motor vehicle collision. Dr. Wallen testified that, in connection with doing an autopsy on the victim, she had a toxicology screen done on the victim's blood and urine to determine whether there was any drugs or alcohol in her system. She stated that the toxicology screen came back negative for alcohol, and the only drug found in the victim's system was caffeine.

Dr. Wallen testified that she examined the medical records of the Defendant from December 16, 1999, which included a toxicology report on the Defendant. Dr. Wallen stated that the toxicology screen was performed on the Defendant "to determine if there were drugs or alcohol present in the blood or urine." She testified that the medical records stated that blood was drawn from the Defendant at 8:00 p.m. Over the Defendant's objection, Dr. Wallen testified that the toxicology report stated that the collection time of the Defendant's blood was 7:47 p.m., rather than 8:00 p.m., but she did not know why the times were listed differently. She testified that the toxicology report stated that the Defendant's blood alcohol level was 178 milligrams per deciliter, or 0.178 percent. However, Dr. Wallen testified that the toxicology report only tested the Defendant's serumal plasma, not her whole blood. Dr. Wallen stated that she calculated for the

difference in water content between the serumal plasma and whole blood to arrive at the Defendant's blood alcohol level for her whole blood. She testified that she calculated the Defendant's blood alcohol level for her whole blood to be 0.151 percent.

Dr. Wallen testified that she then calculated what the Defendant's blood alcohol level was at the time of the collision. She explained:

> Alcohol is eliminated from the body in various ways, and one of those is metabolism, and one would be excretion through urine; so, that alcohol leaves the body through urine, and that's how we can find alcohol in . . . the urine. . . . [T]here are equations out there that have been worked out that . . . if you put the . . . variables as you know about the individual into the equation such as the weight, you can determine how much . . . alcohol is eliminated from the body per hour. And in this case, . . . it would be the general accepted value to use is 0.017 percent per hour that the alcohol would decrease. And that is assuming the person was in . . . a post absorptive state, meaning that they had already drunk the alcohol, they were no longer drinking alcohol at the time.

Dr. Wallen testified that according to her calculations, the Defendant's blood alcohol level at 6:30 p.m. on December 16, 1999, was 0.177 percent. Dr. Wallen then read the trauma history sheet to the jury, which stated that the Defendant blacked out and had no recall of the events leading up to the collision. She then read from a sheet prepared by a registered nurse that recorded some of the medical history obtained from the Defendant and listed the drugs the Defendant was taking at the time. Dr. Wallen stated that the sheet listed the following drugs: Valium, Soma, Tagamet and Phenegran. She then read from a "trauma flow sheet" which reported that the Defendant "stat[ed] that she had three . . . alcoholic drinks." Dr. Wallen testified that if a person drank one beer with a five percent alcohol content at 2:30 p.m. on December 16, 1999, and did not drink any more alcoholic beverages that day, then that person's blood alcohol level would be zero at 6:30 p.m. on that day.

On cross-examination, Dr. Wallen testified that the Defendant was given four milligrams of morphine intravenously at 7:51 p.m., according to the medical records. She stated that she could not tell from the medical records whether the morphine was administered to the Defendant instantly by pushing the four milligrams of morphine into the I-V all at once or whether it was administered slowly. Dr. Wallen testified that according to the medical records, the Defendant received fluids intravenously from 7:51 p.m. until after 12:00 a.m. on December 17, 1999. She testified that Johnson City Medical Center had a procedure in place to ensure the integrity of the blood tests performed at the hospital:

> They have a sticker in the chart under the trauma flow sheet, and they have . . . stickers on here that would correspond to the stickers that would be put on the tubes of blood. And on these they have the medical record number, and the code name that corresponded to [the Defendant] at the time. . . . The main thing is labeling the tube

with . . . the defendant's–in this case, the patient's blood identification. As long as a tube is identified and says it's from her, and that it was, in fact, drawn from her and labeled by the same person that drew the blood then that's . . . how we in labs keep track of specimens.

She testified that all labs have quality assurance programs in place in order to be accredited. She explained that the Johnson City Medical Center lab was accredited and, "therefore, they run their quality control on the specimens and that would ensure the accuracy of every specimen that comes off the machine." On re-direct examination, Dr. Wallen testified that the toxicology report also stated that the Defendant tested positive for benzodiazepine and opiates. She stated that benzodiazepine was a form of Valium, which was a kind of relaxant. Dr. Wallen explained that opiates include substances such as morphine, opium, oxycodone and Oxycontin. She stated that medical center personnel placed a total of nine stickers that had the Defendant's identification on them on tubes of the Defendant's blood on December 16, 1999. Thereafter, the State rested its case.

Following the State's proof, the Defendant made a motion for judgment of acquittal, which the trial court denied. The Defendant then called Richard Allen Jenkins, the Defendant's brother, to testify. Jenkins testified that he saw the Defendant at around 2:00 p.m. on December 16, 1999, at a bar in Mountain City, because he called her to take him to his hair cut appointment at 2:30 p.m. He stated that he was at the bar playing pool when he called the Defendant for a ride, and she arrived at the bar at approximately 2:05 p.m. Jenkins testified that he called the Defendant for a ride because he drank four or five beers and did not feel comfortable driving. Jenkins testified that when the Defendant arrived at the bar to pick him up, she appeared sober. He testified that prior to leaving for his hair appointment, he and the Defendant played a game of pool at the bar. Jenkins stated that the Defendant asked him for a drink of his beer, but he refused and bought her a Zima, a citrus alcoholic drink. He testified that the Defendant only drank one Zima at the bar because they had to leave for his hair appointment. He stated that the Defendant drove him to his appointment, and both he and the Defendant ended up getting their hair cut.

On cross-examination, Jenkins testified that the Defendant did not work during the week because she was a housewife. He stated that he was drinking Zima the entire time he was at the bar before the Defendant arrived. Jenkins testified that the Defendant told him that she could not remember anything about the collision or even having the collision. He stated that the Defendant told him that she had her son in the car when the collision occurred because she was taking her son to karate practice. Jenkins testified that, after they got their hair cut, the Defendant dropped him off at the bar at about 3:00 p.m. and she returned home. He stated that the Defendant "said she had to go home and wrap Christmas presents before her son got home from school, and take him to karate." He explained that he did not see her again until she returned home from the hospital on December 17, 1999. Jenkins stated that he did not visit the Defendant in the hospital on the night of the collision because he had to look after his mother and his nephew. He testified that the Defendant's family did not drink alcoholic beverages in their house and did not keep alcohol in the home. Jenkins stated that the Defendant never told him that she had anything alcoholic on December 16, 1999, other than the one Zima at the bar. He stated that the Defendant was on medication of some

sort on the day of the collision, but he did not know what kind of medication. Jenkins testified that he believed she took medications for muscle spasms.

Barbara Ann Hampton testified that she was the Defendant's best friend. Hampton testified that after she dropped her children off at school on December 16, 1999, she went to the Defendant's home to wrap Christmas presents and visit with the Defendant. Hampton stated that while at the Defendant's home, the Defendant did not drink any alcoholic beverages in her presence. She testified that she and the Defendant drove to the post office to mail a present to one of the Defendant's nephews at 12:30 p.m. Hampton reported that she left the Defendant's home between 1:00 p.m. and 2:00 p.m. after the Defendant received a phone call. She testified that the Defendant called her at 3:30 p.m. that day and did not slur her speech or sound unusual at that time. Hampton stated that the Defendant called her again at 5:45 p.m. to tell her that she could not find her keys and that her son needed to get to karate practice. Hampton testified that she told the Defendant that she would take her son to karate if the Defendant could not find her keys by the time Hampton got to the Defendant's home.

Hampton reported that after she dropped her daughter off at baton practice, she drove toward the Defendant's home on Cold Springs Road and saw flashing lights on the road. Hampton testified that she saw the Defendant's car in the middle of the road and saw the Defendant, but she did not see the Defendant's son, Tyler Malinovsky, anywhere. She stated that she started looking for Tyler Malinovsky and finally saw him in the ambulance, so she approached him. Hampton testified that when she asked him what happened, Tyler Malinovsky told her, "momma was playing with the radio." She reported that when she talked with the Defendant at the crash scene while she was on the stretcher, she did not smell the odor of alcohol on the Defendant. She stated that she was at the scene for approximately twenty minutes, and while she was at the scene, she called the Defendant's mother to tell her about the accident. Hampton reported that she then went to the medical center to wait on the Defendant, and an emergency medical technician gave her the Defendant's pocketbook. She stated that she then went to the Defendant's house to get the work number for the Defendant's husband and called him at work. She reported that she then picked up her daughter from practice and returned to her home. Hampton stated that the Defendant called her at about 9:00 p.m. that night and asked her where her son was located and if he was all right. She testified that the Defendant called her three more times after that initial call from the hospital and expressed concerns about her son and whether her mother and husband knew about the collision.

On cross-examination, Hampton stated that the Defendant told her that she only had one Zima on the day of the collision. She testified that she did not know what the Defendant did between 2:00 p.m. on December 16, 1999, and the next day, except for the brief telephone conversations. Hampton stated that the Defendant told her "everything happened so fast" and that she could not recall what caused the collision.

Frank Malinovsky, the Defendant's husband, testified that his son was seven years old when the collision occurred. He stated that Hampton called him about the collision at his hotel room in Spartanburg, South Carolina at about 8:45 p.m. on December 16, 1999. Frank Malinovsky stated

that no alcoholic beverages were stored in his home since his son was born. He explained that he and the Defendant had a rule that they would not keep any alcohol inside the house due to the age of their son. On cross-examination, Frank Malinovsky testified that the Defendant "kept on saying that it wasn't her fault. . . ." He stated that the Defendant never told him why she told the hospital personnel that she drank three alcoholic beverages. Frank Malinovsky explained that the Defendant told him that she had no recollection of what happened the night of the collision. He stated that he never drank alcohol and never observed the Defendant drinking alcoholic beverages. Frank Malinovsky explained, "I'm an ex-alcoholic for one, so, I don't allow no kind of alcoholic beverages around me." He stated that the Defendant took Valium, Soma and Phenergan as her medications when she needed them.

Tyler Malinovsky, the Defendant's minor child, testified that he was eight years old at the time of the trial. Tyler Malinovsky stated that the Defendant "was messing with the radio" when she collided with the victim's car. He testified that he was in a seatbelt when the crash occurred. Tyler Malinovsky reported that emergency workers put him in an ambulance at the crash scene. He stated that Hampton came and talked to him while he was in the ambulance. He explained that someone other than Hampton took him to his grandmother's home after the collision. On cross-examination, Tyler Malinovsky testified that the Defendant was taking him to karate practice that night so he could "earn a yellow stripe." He stated he was in the front seat because the back seats had "bad seatbelts." He explained that when the collision occurred, he hit the air bag that came out of the passenger side. Tyler Malinovsky explained that he did not know how fast the Defendant's car was traveling when the collision occurred. He stated that he told a police officer that he and the Defendant were in a car collision, but he did not tell the police officer that she was messing with the radio. Tyler Malinovsky explained that a month prior to the trial, he "remembered the wreck and everything."

Dr. David T. Stafford, a forensic toxicologist, testified that he had experience in analyzing blood alcohol levels and evaluating toxicology reports. The trial court then declared Dr. Stafford an expert in forensic toxicology. He stated that he examined the Defendant's medical records from December 16, 1999. Dr. Stafford testified that, according to the medical records, hospital personnel administered morphine to the Defendant at 7:35 p.m. He stated that on the night of the collision, the Defendant's height was five feet and her weight was 108 pounds. Dr. Stafford stated that four milligrams of morphine sulfate would have caused the Defendant to be drowsy. He explained, "[t]he morphine sulfate acts as a central nervous system depressant. It slows down the functions of the brain. It slows down the gastric motility, and it makes the person somewhat . . . lethargic." Dr. Stafford testified that morphine would continue to cause the Defendant to be drowsy and lethargic two hours after it was administered. He stated that the opiates that the Defendant tested positive for might have shown up in the urine screen because of the morphine the Defendant was given at the hospital.

Dr. Stafford testified that the toxicology report listed the collection time as 7:47 p.m. on December 16, 1999. He stated that elsewhere in the medical records, the first indication of any blood being drawn from the Defendant was between 8:00 and 8:05 p.m. Dr. Stafford testified that it was

unusual to have such a discrepancy in the medical records and that he had never seen such a discrepancy in his thirty years of experience. He explained that "[m]ost of the hospital records that I review will have an identification number with that sample, and there will be a time of [when] that sample was collected, and that identification will carry throughout the analysis." He stated that he could not find any identification from a specific sample in the records. Dr. Stafford testified that a mix-up in samples could account for the time discrepancy in the records. He explained:

> Well, obviously, there could have been a mistake in writing down the time. However, the times of all of these samples are consistent, and the time at 8:00 to 8:05, and the times of the records upon which the toxicology were done, those samples are consistent with being 7:47. So, it doesn't depend–those are different–those have to be different samples, one's a blood, one's a urine. So, . . . the most likely explanation that I can determine would be a mix up of samples.

Dr. Stafford further testified that the blood alcohol level listed on the toxicology report was "certainly not consistent with what I would expect of an individual of [the Defendant's] size, and the amount that was indicated to have been consumed, and her actions."

Dr. Stafford testified that a Zima alcoholic beverage contained 4.8 percent alcohol by volume, which was the same as any standard twelve ounce beer. He explained that if the Defendant only drank one Zima on an empty stomach, that amount of alcohol would be insufficient to cause her to be intoxicated. Dr. Stafford stated that a person of the Defendant's size who drank one Zima at 2:00 p.m. would not be intoxicated at all at 6:30 p.m. that day. He testified that the Defendant's blood samples may have been switched because "there [was] no record, or identification of this particular sample. That doesn't mean that it was switched, but it doesn't . . . identify this as the sample that was collected from her." Dr. Stafford stated that the trauma flow sheet also had some suspect markings. He explained that "[t]here is a name written in, and then scratched out. Another name written in and scratched out, and then Hart written in above, and initialed again by HB, Holly Broadwater, the nurse. And there's also an age here that is changed from a 34 to a 36 . . . ." He stated that the collection time discrepancy in the records caused him to believe that there was a mix up of blood specimens. Also, he reported that the toxicology report listed the Defendant's sex as "male." He explained that the medical records indicated that the Defendant blacked out and could not recall the events leading up to the collision. Dr. Stafford also testified that the blood sample from the Defendant may have been contaminated because it was taken from the I-V site instead of directly from a vein. He explained that they may have used an alcohol swab to clean the area where they were drawing blood, which could account for an increase in the blood alcohol level of the Defendant.

On cross-examination, Dr. Stafford testified that the medical records indicated that the Defendant "was positive for ethyl alcohol." He stated that a doctor may have detected an odor of an alcoholic beverage on the Defendant during an examination at the hospital. Dr. Stafford acknowledged that the trauma sheet indicated that the Defendant was involved in a "head-on" collision and was flown to the hospital by a helicopter. He admitted that the trauma sheet more than

likely belonged to the Defendant. Dr. Stafford stated that the trauma report indicated that the Defendant told medical personnel that she had three alcoholic beverages; however, he testified that drinking three alcoholic drinks prior to the collision could not account for the Defendant's 0.178 blood alcohol level on the toxicology report. He explained that in order to have that blood alcohol level, the Defendant would have consumed more than three alcoholic drinks prior to the collision. Dr. Stafford stated that he had never been to the Johnson City Medical Center and did not know the medical center's procedures. He testified that if the medical center used "Hibiclens" to clean the I-V site, then no contamination of the blood alcohol level would occur. Dr. Stafford stated that assuming the toxicology report was correct, he agreed with Dr. Wallen's calculations that the Defendant's whole blood alcohol level at 6:30 p.m. on December 16, 1999, was 0.177 percent. After presenting her proof, the Defendant rested.

The State then called Deputy Ronald Shupe of the Johnson County Sheriff's Department as a rebuttal witness. Deputy Shupe testified that he interviewed Tyler Malinovsky at approximately 10:43 p.m. on December 16, 1999, at the boy's residence. He stated that he recorded the following statement on a complaint card:

> On the above date and time I went to the residence of six year old Tyler Malinovsky who advised that on this date his mother, [the Defendant], picked him up and was taking him to karate class. Mr. Malinovsky advised he did not know if his mother was drinking alcohol on this date. All Mr. Malinovsky could advise is that he remembered . . . going down the road and the air bag on the vehicle coming out and hitting his face.

Deputy Shupe testified that Tyler Malinovsky did not say anything about the Defendant "messing with the radio" prior to the collision when he interviewed him.

After the jury convicted the Defendant of vehicular homicide and child endangerment, the Defendant waived her right to a jury trial on the aggravated vehicular homicide indictment, and the trial court held a bench trial on that indictment. At the bench trial, the Defendant stipulated that she had two previous convictions for driving under the influence, one in North Carolina and the other in Johnson County. Thereafter, the trial court found the Defendant guilty of aggravated vehicular homicide.

## II. Analysis

On appeal, the Defendant contends the following: (1) that the trial court erred by denying the Defendant's motion to suppress her medical records; (2) that the trial court erred in admitting the Defendant's medical records into evidence; (3) that the Defendant's constitutional right of confrontation was violated by the admission of her medical records into evidence; and (4) that the evidence presented at trial was insufficient to sustain the convictions.

### A. Motion to Suppress

The Defendant argues that the trial court erred by denying the Defendant's motion to suppress her medical records. The standard of review for a trial court's findings of fact and conclusions of law in a suppression hearing was established in State v. Odom, 928 S.W.2d 18 (Tenn. 1996). When the trial court makes findings of fact at the conclusion of a suppression hearing, the facts are accorded the weight of a jury verdict. State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994). The trial court's findings of fact are "presumptively correct on appeal" and are binding upon this Court unless the evidence in the record preponderates against them. State v. Randolph, 74 S.W.3d 330, 333 (Tenn. 2002); State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998); Odom, 928 S.W.2d at 23. The prevailing party in the trial court is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. Furthermore, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Id. However, this Court reviews the trial court's application of the law to the facts de novo, without any deference to the determinations of the trial court. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001).

The Defendant asserts that Trooper Lunceford unlawfully seized her medical records from the hospital in violation of the Fourth Amendment to the United States Constitution and Article I, Section 7 of the Tennessee Constitution. The State counters that the Defendant lacked standing to contest the admission of the records because the hospital owned the records, not the Defendant. The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure . . . against unreasonable searches and seizures, shall not be violated." Article I, Section 7 of the Tennessee Constitution similarly provides "[t]hat the people shall be secure . . . from unreasonable searches and seizures." The Tennessee Supreme Court has explained that the "rights assured by the Fourth Amendment are personal rights, and that they may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure." State v. Ross, 49 S.W.3d 833, 840 (Tenn. 2001) (quoting Simmons v. United States, 390 U.S. 377, 389 (1968)). The United States Supreme Court has held that because Fourth Amendment rights are personal rights, they "may not be vicariously asserted." Rakas v. Illinois, 439 U.S. 128, 133-34 (1978) (quoting Alderman v. United States, 394 U.S. 165, 174 (1969)).

In order to determine whether a defendant's Fourth Amendment rights have been violated, we look to two inquiries: "(1) whether the individual, by his conduct, has 'exhibited an actual (subjective) expectation of privacy,' and (2) whether the individual's subjective expectation of privacy is 'one that society is prepared to recognize as reasonable.'" Ross, 49 S.W.3d at 840 (quoting Katz v. United States, 389 U.S. 347, 361 (1967)). The defendant challenging the reasonableness of a search or seizure has the initial burden of establishing a legitimate expectation of privacy in the place where property is searched or seized. Rawlings v. Kentucky, 448 U.S. 98, 104 (1980); State v. Roberge, 642 S.W.2d 716, 718 (Tenn. 1982); State v. Oody, 823 S.W.2d 554, 560 (Tenn. Crim. App. 1991). This Court listed the following factors applicable to determining whether a defendant's Fourth Amendment rights have been violated: (1) property ownership; (2) whether the defendant had a possessory interest in the thing seized; (3) whether the defendant had a possessory interest in the place searched; (4) whether the defendant had a right to exclude others

from that place; (5) whether the defendant had exhibited a subjective expectation that the place would remain free from governmental invasion; (6) whether the defendant took normal precautions to maintain his privacy; and (7) whether the defendant was legitimately on the premises. Oody, 823 S.W.2d at 560 (citing United States v. Haydel, 649 F.2d 1152, 1154-55 (5th Cir. 1981)).

In Tennessee, "[h]ospital records are and shall remain the property of the various hospitals, subject, however, to court order to produce the same." Tenn. Code Ann. § 68-11-304(a)(1) (Supp. 2003). While Tennessee Code Annotated section 68-11-1502 (2001) states that "[e]very patient entering and receiving care at a health care facility licensed by the board for licensing health care facilities has the expectation of and right to privacy for care received at such facility," a patient's right to privacy in medical records is not absolute.[2] Tennessee Code Annotated section 68-11-1505 (2001) states that "[n]othing in this part shall be construed as prohibiting the information made confidential by the provisions of this part from being subject to the subpoena of a court of competent jurisdiction." Therefore, a patient's right to privacy in his or her medical records is superceded by a properly executed subpoena to the hospital holding the medical records.

In State v. Fears, 659 S.W.2d 370 (Tenn. Crim. App. 1983), this Court addressed the issue of whether a defendant's Fourth Amendment rights were violated when the State subpoenaed a hospital for the defendant's medical records for use in the defendant's trial for aggravated rape of a child. The Court held that:

> The defendant enjoyed no Fourth Amendment protections of his medical records in possession of and owned by the health center. "The Fourth Amendment does not guarantee to a person security against search, reasonable or unreasonable, in papers which are not that person's property and are not in his possession." In Re Upham's Income Tax, 18 F. Supp. 737 (S.D. N.Y. 1937).

Fears, 659 S.W.2d at 376. Furthermore, the Court found that "the defendant had no standing to challenge either the validity of the subpoena or the authority of the District Attorney to issue it. The person to whom the subpoena was directed was the only party having standing to contest the validity of the subpoena." Id.

In this case, the trial court, relying upon State v. Cass, No. 02C01-9612-CC-00489, 1998 WL 22033 (Tenn. Crim. App., at Jackson, Jan. 22, 1998), *perm. app. denied* (Tenn. Oct. 19, 1998) and Fears, 659 S.W.2d at 376, denied the Defendant's motion to suppress her medical records because

---

[2]Another statute which addresses the confidentiality of medical records is Tennessee Code Annotated section 10-7-504(a)(1):

The medical records of patients in state, county and municipal hospitals and medical facilities, and the medical records of persons receiving medical treatment, in whole or in part, at the expense of the state, county or municipality, shall be treated as confidential and shall not be open for inspection by members of the public.

-15-

it found that the Defendant's Fourth Amendment rights were not violated by the State's actions in subpoenaing and introducing her medical records. Furthermore, the trial court found that under Tennessee Code Annotated section 68-11-1505, the Defendant's medical records could be reached by subpoena, despite the Defendant's right to privacy as a patient. We agree with the trial court that the State did not violate the Defendant's Fourth Amendment rights by subpoenaing and copying her medical records. We conclude that the Defendant enjoyed no Fourth Amendment protections of her medical records in possession of and owned by Johnson City Medical Center. Fears, 659 S.W.2d at 376; see Oody, 823 S.W.2d at 560. Furthermore, we conclude that the Defendant's right to privacy in her medical records at Johnson City Medical Center, as provided by Tennessee Code Annotated section 68-11-1502, was "subject to the subpoena of a court of competent jurisdiction." Tenn. Code Ann. § 68-11-1505. Accordingly, when Trooper Lunceford served the subpoena duces tecum upon the records department of the medical center on January 12, 2000, the Defendant's right to privacy in her medical records ceased for purposes of complying with the subpoena. Moreover, we conclude that the Defendant lacked standing to contest the validity of the subpoena duces tecum, because only the person to whom the subpoena was directed, which in this case was the Johnson City Medical Center, may contest the validity of the subpoena. Therefore, we conclude that the trial court did not err by denying the Defendant's motion to suppress her medical records.

## B. Admissibility of Medical Records

The Defendant next contends that the trial court erred in admitting her medical records because "the records contained such errors, inconsistencies and mistakes that rendered the records untrustworthy by the method in which they were compiled and prepared." The admissibility of evidence is a matter within the discretion of the trial court and will be overturned only when there is an abuse of that discretion. State v. James, 81 S.W.3d 751, 760 (Tenn. 2002); State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997); Otis v. Cambridge Mut. Fire Ins. Co., 850 S.W.2d 439, 442 (Tenn. 1993). "[A]n appellate court should find an abuse of discretion when it appears that the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." James, 81 S.W.3d at 760 (quoting State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002)).

Tennessee Rule of Evidence 803(6) provides that the following are not excluded by the hearsay rule:

> Records of Regularly Conducted Activity. A memorandum, report, record, or data compilation in any form of acts, events, conditions, opinions, or diagnoses made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or by certification that complies with Rule 902(11) or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term

"business" as used in this paragraph includes business, institution, profession, occupation, and calling of every kind, whether or not conducted for profit.

In order for the records to have sufficient indicia of trustworthiness to qualify as a business record, "the record must have been made in the 'regular practice of that business activity,' and it must have been 'kept in the course of a regularly conducted business activity.'" Neil P. Cohen et al., *Tennessee Law of Evidence,* § 8.11 [6] (4th ed. 2000); see also State v. Dean, 76 S.W.3d 352, 365 (Tenn. Crim. App. 2001). While records prepared for an irregular purpose with litigation in mind "may not be made in the regular course of business and may be inadmissible as a business record under Rule 803(6)," investigative accident reports compiled as a routine matter by a business "should not be excluded solely because litigation sometimes ensues following an accident." Cohen, supra, at § 8.11 [6]. This Court explained that in order for the records to qualify for the business records exception to the hearsay rule, the following prerequisites must be met:

> (1) the records "custodian or other qualified witness" must testify; (2) the record must have been made at or near the time of the event, act, or condition; (3) a person with personal knowledge of the recorded event must have transmitted the information; (4) this person must have possessed a business duty to record the information; and (5) the record must have been made and kept in the regular course of business. Tenn. R. Evid. 803(6); see generally Neil P. Cohen et al., *Tennessee Law of Evidence,* § 803(6) (3rd ed. 1995).

State v. Carroll, 36 S.W.3d 854, 867-68 (Tenn. Crim. App. 1999).

The Defendant asserts that the medical records introduced at trial lacked sufficient indicia of trustworthiness because the medical records "revealed that defendant's blood was tested 13 minutes prior to any blood being drawn from her for testing." The Defendant further argues that because of these "obvious and unexplained errors and/or omissions," the trial court abused its discretion in admitting her medical records "without requiring testimony from those persons handling the blood specimens, performing the test, and establishing a chain of custody of the specimens." We disagree with the Defendant's assertions. The State satisfied the requirements of Tennessee Rule of Evidence 803(6) through the testimony of McKee and Dr. Wallen. McKee, the records custodian at the hospital, testified that the medical records were kept in the regular course of business and were made on December 16, 1999, the date of the collision. Dr. Wallen testified about the procedures at the medical center in testing patients' blood and the quality control policies in place at the medical center's lab. While the Defendant's expert in forensic toxicology, Dr. Stafford, testified about the inconsistencies in the Defendant's toxicology report and the fact that there may have been a "mix-up" in specimens, such testimony did not "indicate lack of trustworthiness" in the medical records. Dr. Stafford testified that he did not know any of the procedures in place at the medical center to ensure quality control of blood specimens, and he admitted that the Defendant's toxicology report showing her blood alcohol level could have been accurate. The Defendant had the opportunity at trial to attack the credibility of the toxicology report through the testimony of Dr. Stafford and vigorous cross-examination of Dr. Wallen and McKee.

Accordingly, we conclude that the trial court did not abuse its discretion in admitting the Defendant's medical records into evidence as business records under Tennessee Rule of Evidence 803(6).

## C. Right to Confrontation

Next, the Defendant contends that the trial court's admission of her medical records into evidence violated her right to confront the witnesses against her because the State introduced the medical records "as the only evidence of intoxication." However, the Defendant failed to raise this issue in her motion for a new trial. Tennessee Rule of Appellate Procedure 3(e) provides in pertinent part as follows:

> [I]n all cases tried by jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.

We conclude that the Defendant waived this issue because she failed to specifically state this issue in her motion for a new trial. Tenn. R. App. P. 3(e); see State v. Martin, 940 S.W.2d 567, 569 (Tenn. 1997); State v. Boxley, 76 S.W.3d 381, 390 (Tenn. Crim. App. 2001). However, even if this issue was not waived, we conclude that this issue was without merit. Contrary to the Defendant's assertions, the Defendant had ample opportunity to fully cross-examine all of the State's witnesses, including witnesses who testified about the Defendant's medical records. In addition, the Defendant introduced her own forensic toxicologist to attack the credibility of her medical records and the toxicology report. Furthermore, in addition to the toxicology report, the State introduced other evidence that tended to show that the Defendant was intoxicated, including Trooper Lunceford's testimony that the Defendant appeared intoxicated on the night of the collision and smelled of alcohol, and the Defendant's admission to medical personnel that she had three alcoholic beverages prior to the collision.

## D. Sufficiency of the Evidence

Finally, the Defendant argues that the evidence presented at trial was insufficient for a rational trier of fact to find the Defendant guilty beyond a reasonable doubt. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. Buggs, 995 S.W.2d at 105; Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

The Defendant was convicted of the following offenses: (1) aggravated vehicular homicide and (2) child endangerment. We note that after the jury convicted the Defendant of vehicular homicide, the trial court found the Defendant guilty of aggravated vehicular homicide and merged the two convictions. After thoroughly reviewing the record in the light most favorable to the State, we conclude that a rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt.

Tennessee Code Annotated section 39-13-218 (1997) defines aggravated vehicular homicide as follows:

> (a) Aggravated vehicular homicide is vehicular homicide, as defined in § 39-13-213(a)(2), where:
> (1) The defendant has two (2) or more prior convictions for:
> (A) Driving under the influence of an intoxicant;
> (B) Vehicular assault; or
> (C) Any combination of such offenses; . . .
>
> (b)(1) As used in this section, unless the context otherwise requires, "prior conviction" means an offense for which the defendant was convicted prior to the commission of the instant vehicular homicide and includes convictions occurring prior to July 1, 1996.
> (2) "Prior conviction" includes convictions under the laws of any other state, government, or country which, if committed in this state, would have constituted one (1) of the three (3) offenses enumerated in subsection (a)(1) or (a)(2). In the event that a conviction from a jurisdiction other than Tennessee is not specifically named the same as one (1) of the three (3) offenses enumerated in subsection (a)(1) or (a)(2), the elements of the offense in the other jurisdiction shall be used by the Tennessee court to determine if such offense constitutes one (1) of the prior convictions required by subsection (a).

Before a defendant can be convicted of aggravated vehicular homicide, the defendant first must be convicted of vehicular homicide under Tennessee Code Annotated section 39-13-213(a)(2) (1997). See Tenn. Code Ann. § 39-13-218(c). Tennessee Code Annotated section 39-13-213(a)(2) defines vehicular homicide as "the reckless killing of another by the operation of an automobile, airplane, motorboat or other motor vehicle . . . [a]s the proximate result of the driver's intoxication as set forth in § 55-10-401. For the purposes of this section, 'intoxication' includes alcohol intoxication as defined by § 55-10-408, drug intoxication, or both." Tennessee Code Annotated section 55-10-401(a) (1998) sets forth the definition of driving under the influence of an intoxicant as follows:

> It is unlawful for any person to drive or to be in physical control of any automobile or other motor driven vehicle on any of the public roads and highways of the state, or on any streets or alleys, or while on the premises of any shopping center, trailer park or any apartment house complex, or any other premises which is generally frequented by the public at large, while:
> (1) Under the influence of any intoxicant, marijuana, narcotic drug, or drug producing stimulating effects on the central nervous system; or
> (2) The alcohol concentration in such person's blood or breath is ten-hundredths of one percent (.10%) or more.[3]

The Defendant argues that insufficient evidence exists to support her conviction of aggravated vehicular homicide because "[t]he medical records in evidence do not establish that defendant's blood alcohol was one-hundredth of one percent or greater beyond a reasonable doubt for the reason that the records themselves disprove any and all reliability of that data." We disagree with the Defendant's assertion. Viewing the evidence in the light most favorable to the State, we conclude that a rational trier of fact could have found the essential elements of aggravated vehicular homicide beyond a reasonable doubt.

First, the evidence was undisputed that on December 16, 1999, at approximately 6:30 p.m., the Defendant was driving her car westbound on Cold Springs Road at about sixty-six miles per hour in a forty-five mile per hour zone when she veered over the center line and collided "head-on" with the victim's car, killing the victim. Story, the emergency medical technician, testified that he smelled "something" on the Defendant immediately after the collision but could not be certain that the odor was alcohol. Trooper Lunceford testified that when he interviewed the Defendant at the hospital, she appeared to be intoxicated due to her slurred speech, mood swings, blood-shot eyes and red face, and she smelled of alcohol. He further testified that the Defendant told him that she had a couple of beers prior to the collision. Dr. Wallen, using the toxicology report in the Defendant's medical records, testified that according to her calculations, the Defendant's blood alcohol level at 6:30 p.m. on December 16, 1999, was 0.177 percent. Dr. Wallen also testified that according to the medical records, the Defendant told medical personnel that she drank three alcoholic beverages prior

---

[3]The 2002 amendment to Tennessee Code Annotated section 55-10-401, effective July 1, 2003, substituted "eight-hundredths of one percent (.08 %)" for "ten-hundredths of one percent (.10%)" in (a)(2). 2002 Tenn. Pub. Acts, ch. 855, § 15.

to the crash. Moreover, the evidence was undisputed that the Defendant had two previous convictions for driving under the influence.

The Defendant presented her own witnesses in an attempt to establish that she was not intoxicated at the time of the collision. While Dr. Stafford's testimony attacked the credibility of the medical records, Dr. Wallen's testimony and McKee's testimony bolstered the trustworthiness of the medical records. After both sides presented evidence at trial, the jury resolved questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence. We may not re-weigh or re-evaluate the evidence. We conclude that the evidence presented at trial overwhelmingly supports the jury's finding that the Defendant recklessly killed the victim "by the operation of an automobile, airplane, motorboat or other motor vehicle . . . [a]s the proximate result of the driver's intoxication as set forth in § 55-10-401," Tenn. Code Ann. § 39-13-213(a)(2), and the evidence further supports the trial court's judgment finding the Defendant guilty of aggravated vehicular homicide due to the Defendant's previous driving under the influence convictions. Tenn. Code Ann. § 39-13-218(a)(1)(A).

Lastly, we address whether sufficient evidence exists to support the Defendant's conviction of child endangerment. Tennessee Code Annotated section 55-10-414 (1998) defines child endangerment as follows:

> A person who violates § 55-10-401, and who at the same time of the offense was accompanied by a child under thirteen (13) years of age:
> (1) Commits the offense of child endangerment, a Class A misdemeanor, punishable by a mandatory minimum incarceration of thirty (30) days and a mandatory minimum fine of one thousand ($1,000), which incarceration and fine shall be in addition to any other incarceration and fine required by law. . . .

The evidence was undisputed that the Defendant's six-year old son was in the front passenger's seat of her car when the Defendant collided "head-on" into the victim's car on December 16, 1999. Because we conclude that sufficient evidence exists to support the Defendant's conviction of aggravated vehicular homicide, which included a violation of Tennessee Code Annotated section 55-10-401, we conclude that sufficient evidence exists to support the Defendant's conviction of child endangerment.

### III. Conclusion

In accordance with the forgoing authorities and reasoning, we AFFIRM the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE