IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 6, 2005

## STATE OF TENNESSEE v. JAMIE EMERSON NEW

**Appeal from the Circuit Court for Madison County**
**No. 04-31     Donald H. Allen, Judge**

---

**No. W2005-01014-CCA-R3-CD  - Filed January 24, 2006**

---

The Defendant, Jamie Emerson New, was convicted of aggravated sexual battery and sentenced to eight years of incarceration.  On appeal, he contends that; (1) the evidence is insufficient to sustain his conviction, and (2) the two child witnesses who testified against him were not competent to testify.  Finding no reversible error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ALAN E. GLENN, JJ., joined.

Jeff Mueller, Jackson, Tennessee, for the Appellant, Jamie Emerson New.

Paul G. Summers, Attorney General and Reporter; Jane L. Beebe, Assistant Attorney General; James G. (Jerry) Woodall, District Attorney General; Alfred L. Earls and Shaun A. Brown, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION
## I.  Facts

        This case arises from the Defendant's conviction for aggravated sexual battery.  Before his trial, the Defendant contended that the two child witnesses who testified against him were not competent to testify.  Accordingly, the trial court allowed the witnesses to be questioned outside the presence of the jury in order to determine their competency.  One child witness, K.T.,[1] testified during direct examination that she knew the difference between a lie and the truth.  She explained that a lie is when one tells a story and that, when one tells a lie, he or she gets into trouble.  She said that she has never told a lie.  Upon questioning by  the trial court, K.T. testified that she knew that

---

[1] In order to protect the privacy of the victim and her family, we will use initials instead of names where appropriate to do so.

lying got people into trouble, she understood that she needed to tell the truth when she testified in court, and, if she did not tell the truth, then she could get into serious trouble. On cross-examination, K.T. testified that her mother told her to tell the truth when testifying in court, she had already talked to her mom about what happened, and she did not know how many times she discussed with other people the incident at issue.

The other child witness, D.B., testified during direct examination that he can differentiate between what is true and what is false. He said that he gets whipped when he lies, and said that he would tell the truth if he was allowed to testify. Upon questioning of the trial court, D.B. said that he realized that he needed to tell the truth about what occurred between the Defendant and his sister. He said that he understood that, if he did not tell the truth, he may be in trouble with the court and with the judge. On cross-examination, D.B. said that a lie is when one is not telling the truth and the truth is when one is not telling a lie.

The trial court determined that both witnesses were competent, and the jury was brought back into the courtroom. Thereafter, the following evidence was presented during the Defendant's trial. K.T.[2] testified that, on the night of the crime, her parents were not home, and the Defendant was baby-sitting herself and her three brothers. She said that, pursuant to the Defendant's instructions, D.B. squeezed into her mother's room and got a "naked" movie. K.T. said that the entertainment center broke, and something happened to her brother's stomach, and then D.B. got the movie and gave it to the Defendant who put the movie in the VCR so they could watch some of the movie. She testified that, while she was on the couch, the Defendant kissed her on the lips, rubbed her on the leg, kissed her on the leg, and touched her private. K.T. remembered that she was wearing shorts and a t-shirt and that the Defendant touched her on the inside of her clothing when he touched her private. She testified that he put his hand in her shorts but did not stick anything inside her, and he did not keep his hand in her shorts that long. K.T. testified that D.B. smacked the Defendant's hand away from her private, but he did not say anything to the Defendant. K.T. testified that, after D.B. smacked the Defendant's hand away, nothing else happened. K.T. said that the Defendant turned the movie off when her mother pulled up in the driveway, and K.T. told her mother and the police what happened that night. K.T. testified that she did not want to watch the movie, but the Defendant told her that he would tell her mother that she had watched the movie if she did not watch the movie. K.T. said that they did not watch the movie for very long, and she did not want the Defendant to touch her private. When asked where the Defendant touched her, K.T. pointed to her groin area and testified that the Defendant touched her in the part that she uses to go to the bathroom.

On cross-examination, K.T. said that she remembered talking with people from the prosecutor's office about what the Defendant did to her and that she has talked with numerous adults about what happened. She said that the Defendant babysat for them on several occasions, but the Defendant never scolded them and never told them that they could not do certain things. She explained that sometimes the Defendant would try to make the kids do the right thing. She said that

---

[2]K.T.'s mother later testified that she was born on September 9, 1996, making her eight years old at the time of trial.

the Defendant never "got after" the kids for going into their mother's room and that, when the Defendant babysat for the kids, he would cook them dinner and tend to their needs. She said that she never knew that the "naked" videos and candy were in her mother's room.

D.B.[3] testified that he knew the Defendant, and that, on the night of the crime, the Defendant sent him into his mother's room to get some batteries for a remote so that they could watch the "naked" tape. D.B. said that, earlier, the Defendant sent him into the room to get the "naked" tape. He explained that, after he got the batteries, the Defendant made D.B. and K.T. sit down and watch the tape. He recalled that the Defendant kissed K.T. on the leg, touched K.T. on her private area, and kissed K.T. on the lips. D.B. remembered that the Defendant put his hand in his sister's shorts on the part that people use to go to the bathroom. D.B. testified that he hit the Defendant on his back, but he did not say anything to him. He said that they watched a little of the "naked" tape before the Defendant turned it off. He testified that his mother came home after these events occurred, and he told her what happened the next morning. D.B. testified that, the day after the Defendant touched his sister, his mother caught the Defendant trying to make the kids smoke. He explained that the Defendant told the kids that he would whip them if they did not smoke. D.B. testified that he talked with a police officer and people at the Department of Children's Services about the incident that occurred between K.T. and the Defendant.

On cross-examination, D.B. said that he had never been into his mother's room to get candy but that he had been in there before to get movies. He said that, on the night of this incident, he went into his mother's room and stepped up on the entertainment center to get batteries that were in a drawer on a white shelf on the wall. D.B. recalled that, when he opened the drawer containing the batteries, the shelf fell on him. D.B. testified that he got a gash on his stomach, and he was afraid that he was going to get into trouble because he knew he would have to explain the scratch to his parents. D.B. explained that the Defendant babysat for the children in his family fairly often and took care of their needs when he babysat them. D.B. said that he did not like the Defendant when the Defendant disciplined the kids. He testified that he talked with a lot of people about the incident that occurred between K.T. and the Defendant, including a woman from the Department of Children's Services and people from the prosecutor's office. D.B. said that people told him how to answer questions about where the Defendant touched his sister. D.B. said that he did not like the Defendant, and he wanted the Defendant to move out of his house. D.B. testified that he did not say different things to different people when he testified at the preliminary hearing. The Defendant's counsel showed D.B. a transcript from the preliminary hearing and read a portion of the transcript in which D.B. told an attorney for the State that the Defendant had actually touched K.T.'s private area and then read a portion in which D.B. told an attorney for the Defendant that the Defendant did not actually touch K.T.'s private area. D.B. testified that, at the preliminary hearing, he did not say that the Defendant never touched K.T.'s private area. When asked if he made a mistake and if the alleged events between the Defendant and K.T. never happened, D.B. said "no." D.B. agreed that testifying in court is an intimidating experience, that he had to testify twice in court regarding this matter and that he might have gotten confused.

_____

[3] D.B. was ten years old during the time of his testimony.

On redirect examination, D.B. agreed that, at the preliminary hearing, he testified that the Defendant kissed his sister on her leg, touched her on her leg, and touched her on her private. He agreed that he was not lying in court, and he was trying to tell the truth to the best of his ability.

B.G. testified that D.B. and K.T. are her children and that the Defendant is her husband's cousin. She said that the Defendant's house burned down, and he was staying in her house. B.G. learned about what happened to her children the day after the incident occurred. B.G. asked the Defendant what happened to her son's stomach, and the Defendant told her that her cat had gotten into her bedroom, broken something, and scratched her son who was standing outside the bedroom door. B.G. recalled that, the next morning, she discovered that her son had a scrape, and not a scratch. She asked her son about his scrape, and he said that he was getting batteries out of the little cabinet on the entertainment center, and the entertainment center broke in half. She testified that she asked her son how he got a big cut on his stomach, and he explained that he got it while retrieving a "naked" tape from her bedroom. She said that she also learned about what else had occurred between her children and the Defendant. She explained that, after learning of the other allegations against the Defendant, she again asked the Defendant what had happened on the previous night. The Defendant told her that he watched the "naked" tape with the kids because D.B. wanted to watch the tape, but he did not touch K.T. After B.G. found out what happened, she called the police and reported the incident. The next day, she took the children to the Department of Children's Services and reported what happened. On the following day, she took her children to a family doctor because the police officers told her that a hospital emergency room would perform a rape kit on K.T., which would traumatize her. She testified that she had asked the Defendant to move out of her home before this incident when she saw him smoking cigarettes with her children. She said that K.T. had seen a counselor for between eight and nine months but had started wetting her bed and having nightmares. She testified that K.T. is under the age of thirteen years old and was born on September 5, 1996.

On cross-examination, B.G. testified that she was working at a tattoo parlor that was "by appointment only," and she frequently had to go out during evening hours, which was why the Defendant often babysat her children. She said that the entertainment center is located in her bedroom and that the bedroom door is padlocked. She explained that the padlock is attached to the bedroom door with a latch, but the door opens enough so that a person can squeeze through the door. She said that she kept ten or twelve "X-rated" videos in the bedroom. B.G. testified that the kids knew that there were movies in her bedroom, but they did not know what type of movies were in the bedroom. She also said that she kept candy in her bedroom. B.G. explained that her kids knew that she kept the movies underneath the entertainment center and that she kept the candies on a dresser on the other side of the room. Further, she said that the batteries were on a shelf next to the entertainment center. B.G. explained that an adult would have to hold open the door for a child to get through the padlocked door and into her bedroom.

Nancy Carol Newman testified that B.G. brought K.T. in to see her. Newman testified that she is a family nurse practitioner at the Bemis Medical Clinic, and she has been a nurse practitioner for nine years. She said that she examined K.T.'s entire body and performed a pelvic exam on her.

Newman determined that K.T. had no physical problems. She was not able to find conclusive proof of any physical abuse, neglect, or injury. On cross-examination, Newman testified that K.T. did not say that the Defendant penetrated her or hurt her. She agreed that she would not expect any redness or injury if K.T.'s private area had just been touched and that there was nothing inconsistent between her diagnosis and K.T.'s claims. She explained that she has experience and training with whether or not there is bruising or tearing and other physical abuse to a child's genitalia. On redirect examination, Newman testified that, after conducting a full physical examination, she did not find anything that indicated that K.T. had been traumatized.

On direct examination, A.J. Gross testified that he knew the victim's family for the past three and a half years. He said that D.B. told him that K.T. said that the Defendant did not really touch her. He testified that sometimes D.B. and the Defendant did not get along because D.B. had a bad attitude. On cross-examination, Gross said that he did not inform anyone that D.B. was lying about the allegations against the Defendant even though he knew that the Defendant faced criminal charges due to these accusations.

The Defendant testified on his own behalf and agreed that he had a mental condition. He testified that he lived with his cousin and his family after his house burned down. He explained that he helped around the house by cutting the grass, fixing the cars, and babysitting for the kids. The Defendant testified that he knew that he was accused of inappropriately touching the little girl. He said that he could not get through the padlocked door leading to the bedroom, but that a small child could get through the door crack. The Defendant agreed that, when he babysat for his cousin's children, he was generally there alone with them. He denied that he ever watched a "naked" movie with the kids. The Defendant knew that there were "naked" movies in the house because he had seen the parents try to sell the movies to other people. He said that, when babysitting on prior occasions, he had seen D.B. slip into D.B.'s mother's room. The Defendant testified that, when he babysat, he had disciplined the kids by telling them "no" or by making them go in a corner until their parents got home. The Defendant recalled that, on the night of the crime, he did not see D.B. go into D.B.'s mother's room but that one of D.B.'s younger brothers told him that D.B. was in there. The Defendant asked D.B. what he was doing, and D.B. told him that he was trying to get batteries. The Defendant said that he told D.B. to come out because D.B.'s dad would be mad if he knew that D.B. was in the bedroom and that D.B. came out of the bedroom with the batteries and a scratched stomach. The Defendant testified that D.B. asked him not to tell his parents what happened, and the Defendant said that he would try but that it would be hard because the entertainment system was broken. The Defendant said that, next, he cooked the kids something to eat, that the kids then took their baths, and that the kids then went to bed. The Defendant said that he never watched a "naked" movie with the children, and he never touched K.T.

On cross-examination, the Defendant said that he told B.G. that a cat scratched D.B. because he had promised D.B. that he would try not to let D.B.'s parents find out that D.B. was in their bedroom. He said that, in the past, he had problems with D.B. because D.B. threw "fits" when the Defendant disciplined him. The Defendant said that D.B. had told him several times that he did not like the Defendant living in his home, and he wanted the Defendant to leave. The Defendant said

that K.T. had no reason to lie about the Defendant's behavior. The Defendant acknowledged that the kids were in bed when their mother returned home, and they did not have any opportunity to get together and make up lies about his behavior. He said that he never told B.G. that he watched a "naked" video with the kids. The Defendant said that he had caught D.B. smoking cigarettes before.

Based upon this evidence, the jury found the Defendant guilty of aggravated sexual battery.

## II. Analysis

On appeal, the Defendant contends that: (1) the evidence is insufficient to sustain his conviction; and (2) the two child witnesses who testified against him were not competent to testify.

### A. Sufficiency of the evidence

The Defendant alleges that the evidence presented at trial is insufficient to support his conviction for aggravated sexual battery. Specifically, he contends that there was no physical evidence of aggravated sexual battery and that the State's case rests solely on the testimony of two small children. He further alleges that the two children were incompetent to testify. The State counters that the evidence at trial is sufficient to support the Defendant's conviction.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P.13(e); State v. Goodwin, 143 S.W.3d 771, 775 (Tenn. 2004) (citing State v. Reid, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, and all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. Goodwin, 143 S.W.3d at 775 (citing State v. Smith, 24 S.W.3d 274, 279 (Tenn. 2000). It is well-settled law in Tennessee that "the testimony of a victim, by itself, is sufficient to support a conviction." State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993); State v. Williams, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.; see State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000).

Tennessee Code Annotated section 39-13-504(a) (2003) defines aggravated sexual battery as "the unlawful sexual contact with a victim by the defendant or the defendant by a victim if . . . the victim is less than thirteen years of age." Tennessee Code Annotated section 39-13-501 (2003) defines "sexual contact" as "the intentional touching of the victim's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification."

In the case under submission, the evidence, when viewed in the light most favorable to the State, is sufficient to support the Defendant's conviction for aggravated sexual battery. Both the victim and her older brother provided the jury with consistent testimony explaining that the Defendant, while watching an "X-rated" video, reached underneath the victim's clothing and touched her vagina. Further, K.T.'s mother testified that K.T. was born on September 9, 1996, making her less than thirteen years old. After hearing testimony from the Defendant, the two children involved in the incident, and their mother, the jury chose to believe the testimony of the children and their mother. This Court does not second-guess the weight, value, or credibility afforded to the evidence by the jury. Accordingly, we conclude that the evidence is legally sufficient to sustain the jury's finding that the Defendant committed aggravated sexual battery. The Defendant is not entitled to relief on this issue.

### B. Competency of the Witnesses

The Defendant contends that the trial court erred when it found that K.T. and D.B., the two child witnesses, were competent to testify. Specifically, the Defendant contends that D.B. was incapable of relating facts accurately as evidenced by variations in his testimony at the preliminary hearing and at trial. He further alleges that both children failed to give meaningful responses when asked to differentiate between the truth and a lie. The State submits that the trial court properly allowed the witnesses to testify at trial. The trial court found that both of the child witnesses were competent to testify. The trial court noted that K.T.

> [U]nderstands that if you don't tell the truth that you can get into trouble, and she's told me on a couple of occasions here today that she will tell the truth if she's asked to do so. I find that she does understand the nature and the meaning of the oath. I do find that she does have the intelligence to understand the subject matter of the testimony, and also The Court finds that she is capable of relating the facts accurately . . . . The Court does find that she is competent to testify.

With respect to D.B., the trial court noted:

> [C]learly understands the meaning of taking the oath. I asked him if I allowed him to testify would he tell the truth. He said he would. He understands the difference between something – telling something that's not true as opposed to something that is true. He appears to be intelligent . . . . He . . . was able to relate . . . what the facts were about what he was here for, about who this [D]efendant is, and clearly he's able

to relate facts about what he observes . . . . So, The Court finds that he is competent to testify.

Tennessee Rule of Evidence 601 provides that "[e]very person is presumed competent to be a witness except as otherwise provided in these rules or by statute." "Virtually all witnesses may be permitted to testify: children, mentally incompetent persons, convicted felons." Tenn. R. Evid. 601, Advisory Comm. Com. When examining a child's competency to testify a judge should determine whether the child understands the nature and meaning of an oath, has the intelligence to understand the subject matter of the testimony, and is capable of relating the facts accurately. State v. Fears, 659 S.W.2d 370 (Tenn. Crim. App. 1983). The purpose of determining competency of the witness in child sexual abuse cases is to allow a victim to testify if it can be determined that the child understands the necessity of telling the truth while on the witness stand. State v. Ballard, 855 S.W.2d 557, 560 (Tenn. 1993). The question of competency is a matter left to the discretion of the trial court. State v. Caughron, 855 S.W.2d 526, 538 (Tenn. 1993). The trial court's determination on competency will not be overturned absent a showing of an abuse of discretion. State v. Howard, 926 S.W.2d 579, 584 (Tenn. Crim. App. 1996).

After thoroughly reviewing the record, we find that the trial court did not abuse its discretion when determining that the two child witnesses were competent to testify. The record demonstrates that the victim and her older brother understood the nature of their oaths. Both children knew that telling a lie got them "in trouble" and that telling the truth did not. Although the children did not provide perfect definitions of "truth" and "lie," such perfection is not required in order for them to be deemed competent to testify. Through direct questioning, the trial court determined that both K.T. and D.B. knew the difference between a truth and a lie. The interview satisfied the requirements necessary to establish the competency of a child witness and demonstrated that the child witnesses understood the importance of telling the truth. Therefore, the Defendant is not entitled to relief on this issue.

### III. Conclusion

In accordance with the foregoing, we conclude that the trial court did not commit reversible error. Therefore, the judgment of the trial court is affirmed.

ROBERT W. WEDEMEYER, JUDGE

-8-